Richard J. CITTA, D.O.

v.

DELAWARE VALLEY HOSPITAL,
Harvey N. Mogul, D.O., et al.

Civ. A. No. 70–1.

United States District Court,
E. D. Pennsylvania.

May 13, 1970.

Peter J. Verderame, Bristol, Pa.,
Laurence H. Eldredge, Philadelphia, Pa.,
for plaintiff.

Pepper, Hamilton & Scheetz, William
J. O'Brien, Richard J. van Roden, Philadelphia, Pa., for defendants.

OPINION

JOSEPH S. LORD, III, District Judge.

I. INTRODUCTION

This suit claims a deprivation of constitutional rights under the Civil Rights Act of 1871, 42 U.S.C.A. § 1983 (Supp. 1970). Plaintiff initially sought a temporary restraining order directing the defendants to reinstate one of plaintiff's privileges restricted by the defendant Dr. Mogul, Chairman of the Department of Surgery at the Delaware Valley Hospital, on October 17, 1969. On that date Dr. Mogul informed the plaintiff that he could only perform gastrectomies in the presence of a supervising surgeon acceptable to Dr. Mogul. We refused to grant a temporary restraining order because it did not appear that plaintiff's injury was either immediate or irreparable under the terms of F.R.Civ.P. 65(b). We did, however, hold a prompt hearing on January 12, 1970. At that time it appeared that plaintiff's claimed denial of rights guaranteed by the Due Process Clause of the Fourteenth Amendment was prematurely before us due to the existence of a potentially curative administrative remedy still available to him. Plaintiff agreed to avail himself of

that remedy and, pending resort to it by him, we retained jurisdiction of the case. We also reserved decision on defendants' motion to dismiss the complaint because it might have become moot.

Plaintiff took the appeal proffered him by the defendant hospital and a hearing was held by the hospital's medical staff over the space of two evenings in late January. After the restriction of his privileges was upheld by the vote of the medical staff, plaintiff returned to us with several constitutional claims which were the subject of a hearing held on March 3, 1970. At that hearing the stenographic notes of the testimony presented at the defendant hospital's hearing were introduced into evidence, and we took additional testimony. On the basis of that record, we make the following findings of fact.

## II. FINDINGS OF FACT

1. Plaintiff, Richard J. Citta, D.O., is an individual residing at 2 Spinythorn Road, Levittown, Bucks County, Pennsylvania. He is duly authorized to practice osteopathic medicine in the Commonwealth of Pennsylvania and was certified on January 30, 1967 by the American Osteopathic Board of Surgery as competent to practice the specialty of surgery.

2. The defendant Delaware Valley Hospital ("Hospital") was incorporated pursuant to the Pennsylvania Nonprofit Corporation Law of 1933 and became a nonprofit corporation by virtue of a Decree of the Court of Common Pleas of Bucks County, Pennsylvania on March 20, 1956. The Hospital's Articles of Incorporation provide for a Board of Directors of not less than nine nor more than fifteen members.

3. The twenty-one individual defendants are presently serving as members of the Hospital's Board of Directors and nine of them are also members of the Hospital's Medical Executive Board.

4. In 1965 and 1966 the Hospital participated in the Hill-Burton program, receiving $794,440 in federal funds for a rebuilding and enlargement program which expended a total of $3,226,807.22. Pursuant to Federal requirements concerning Hill-Burton funds the Commonwealth of Pennsylvania allocated and administered the Hill-Burton grant to the Hospital.

5. Part of plaintiff's specialty is the major surgical procedure called a gastrectomy, which is the surgical excision of all or any part of the stomach.

6. On or before October 17, 1969 and for some preceding years, plaintiff was a member of the Hospital's Medical Staff ("Corporate Staff") in the Department of Surgery.

7. Plaintiff has no staff affiliations at any other hospital in the Lower Bucks County area and his practice is limited to this area.

8. On or about September 21, 1969, Gerald Maher, a twenty-five year old drug addict (percodan addiction), was admitted to the Hospital in critical condition. At 2:45 a. m. on the morning of September 22, plaintiff was called for an emergency operation on Maher, which began shortly after 4 a. m. The anesthesia chart for that operation reads "[n]o peripheral pulse or blood pressure on arrival in O.R." After the operation Maher's condition was improved but still critical.

9. At 10 a. m. on October 9, 1969, Maher developed an acute gastro-intestinal hemorrhage. With the agreement and concurrence of the attending physicians, Drs. McCafferty and Carroll, that Maher would die within the hour unless emergency surgery were performed, plaintiff conducted a second emergency operation on Maher beginning at 10:45 a. m. Because Maher had no ascertainable blood pressure, the anesthesiologist refused to administer anesthesia to Maher, and plaintiff performed major abdominal surgery with Maher under a local anesthesia. After the operation Maher was returned to his room alert, talking, with good color, but still in critical condition.

10. While in the Hospital Maher received approximately 100 units of blood.

On or about October 10, 1969, Maher was moved to Cooper Hospital in Camden, New Jersey, where he was operated on twice: once on October 11, and again on October 28, 1969. While in Cooper Hospital Maher received 84 units of blood before he died on November 13, 1969.

11. On October 17, 1969, Harvey N. Mogul, D.O., President of the Board of Directors of the Hospital and Chairman of the Department of Surgery, notified plaintiff by letter as follows:

"This is to inform you that you may not perform gastrectomies under your own responsibility. The responsible surgeon must be one whose qualifications are acceptable to the Chairman of the Department of Surgery."

This action in no way restricted plaintiff's other surgical procedures or privileges.

12. Plaintiff can still admit patients to the hospital for gastrectomies as long as he is accompanied by a physician acceptable to the Chairman of the Department of Surgery. That physician need not be Dr. Mogul or a member of the Hospital staff.

13. After receiving this notice, the plaintiff requested that the action of Dr. Mogul be reviewed by the Executive Committee of the Department of Surgery. That Committee never convened a meeting to discuss Dr. Mogul's action concerning the plaintiff, nor was the plaintiff permitted to appear before the Committee. Members of the Committee were contacted individually by Dr. Mogul, the Department Chairman. On November 10, 1969, Dr. Mogul wrote plaintiff that "the [Executive Committee of the Department of Surgery] voted to uphold the revocation by the Chairman of the Department of Surgery."

14. On November 21, 1969, the Medical Executive Board of the Hospital held a meeting which is summarized in pertinent part by the minutes of the meeting as follows:

"1. Revocation of Dr. Citta's gastrectomy privileges. Dr. Mogul dis-cussed the reasons for above action. A motion was made by Dr. Carroll to uphold the action of the Chairman of the Department of Surgery. Seconded by Dr. Pearson. Motion passed unanimously."

This action was based on what Dr. Mogul told the Medical Executive Board he had observed with respect to Gerald Maher at Cooper Hospital on October 11, 1969. At that time Maher's abdomen was opened by surgeons in Cooper Hospital while Dr. Mogul was present.

15. The first knowledge plaintiff had of this Executive Board meeting was contained in a letter from the secretary of that Board dated December 10, 1969 which stated:

"This letter is to inform you that the decision made by the Medical Board, at the meeting of November 21, 1969, was to uphold the action of the Chairman of the Department of Surgery regarding Gastrectomy privileges."

16. Plaintiff was not given an opportunity to appear before the Medical Executive Board.

17. By letter dated January 13, 1970 Dr. Mogul wrote to plaintiff:

"The revocation of your privileges to perform gastrectomies is based on your participation in the care and treatment of Gerald Maher, who died on November 13, 1969. * * * [A] review of the entire course of Mr. Maher's hospitalization leads us to conclude that there are serious problems concerning your participation in the surgery and care of Mr. Maher. Among other things, we question the adequacy of the gastrectomy, the surgical technique, the general management of the case from your standpoint, and the cause of the findings observed at the procedure subsequent to the ones performed by you."

This letter was the first notice formally received by the plaintiff from Dr. Mogul as to why his privileges had been restricted on October 17, 1969.

18. Plaintiff took an appeal from the decision of the Executive Medical Board

to the Corporate Staff, which is composed of all those physicians who are members of the Hospital in good standing under Article III, § 1 of the By-Laws of the Hospital staff.

19. Hearing on this appeal was held at the Hospital on the evenings of January 19 and 20, 1970.

20. Plaintiff was represented by counsel at this hearing; counsel called witnesses on plaintiff's behalf and conducted cross-examination of witnesses.

21. The Corporate Staff heard in detail the explanation for the restriction of plaintiff's surgical privileges, plaintiff's testimony concerning his operative procedures, and various conflicts in the testimony concerning the extent of plaintiff's operations on Maher including references to the Hospital charts concerning Maher.

22. The evidence presented before the Corporate Staff in support of plaintiff on the one hand, and in support of the action of the Executive Medical Board on the other hand was in sharp conflict as to the propriety and adequacy of plaintiff's treatment of Maher.

23. Plaintiff's request for a vote at the conclusion of the testimony was agreed to, but the defendants refused to frame the issue as follows: "Is Dr. Citta competent and otherwise qualified to perform gastrectomies on his own responsibility?"

24. Dr. Mogul presided throughout the hearing in a fair and reasonable manner, and at the conclusion of the testimony on the second evening called for a vote on the question "Do you support the action of the Medical Executive Board?"

25. The vote on this question was limited to physician-members of the Corporate Staff who attended the hearing (proxies of physicians not in attendance were not permitted) and was conducted by secret ballot.

26. The Corporate Staff upheld the restriction of plaintiff's privileges by a vote of 22 ballots "yes", 14 ballots "no" and one abstention.

27. The Hospital is an osteopathic institution which does not have a surgical residency program at the present time, having lost that right in 1966 after a review of the Hospital by the American Osteopathic Association.

28. After that review by the Association, Dr. Harvey N. Mogul was named Chief of Surgery. After a thorough review of surgical privileges, all surgeons' privileges were reduced. Plaintiff's privileges were reduced on June 13, 1966, so that he cannot perform the following surgical procedures: total gastrectomy, pancreatic surgery, chest surgery, radical gland dissection of the neck or pelvis, abdominal-perineal resections, Wertheim procedure, hemipelvectomy, radical mastectomy.

29. Plaintiff's gastrectomy work constituted a very small part of the work performed by him at the Hospital. Since 1967, he has averaged three gastrectomies a year, and has performed a total of thirteen since he was licensed. By comparison, his total of major and minor procedures exceeded 250, 240, and 200 in 1967, 1968, and 1969, respectively.

30. The Chairman of the Department has the function of evaluating and changing the privileges of the department.

## III. DISCUSSION

### A

■ We first consider the defendants' motion to dismiss the complaint for failure to state a claim under the Civil Rights Act.[1] Plaintiff has maintained

---

1. It can be argued, and defendants apparently do, that a complaint that fails to state a claim under 42 U.S.C.A. § 1983 also fails to confer jurisdiction upon the district court under 28 U.S.C.A. § 1343(3) because the two sections are congruent, i. e., the court is granted jurisdiction in § 1343(3) of Title 28 only over those cases which state a claim under section 1983 of Title 42. However, this contention overlooks the old learning that the statement of a "substantial" federal question confers jurisdiction on the district court even if the claim is

that the requisite "state action" required under the Fourteenth Amendment is found in the Delaware Valley Hospital's receipt of federal funds under the Hill-Burton Program[2] in the amount of $794,440 during 1965 and 1966. This sum represented one-third of the total cost of construction, approximately $2,-383,320. Defendants argue that these facts do not present sufficient state involvement to constitute state action under the Fourteenth Amendment, or, *a fortiori*, action under "color of state law" within the terms of 42 U.S.C.A. § 1983 (Supp.1970). They argue that the Hospital's receipt of Federal funds was not "massive" or substantial, enough to "merit the cloak of federal jurisdiction." Defendants reinforce this contention with the assertion that the restriction of surgical privileges allegedly without due process is a constitutional deprivation of such lesser dimension[3] that, when combined with the receipt of a small amount of state-administered federal funds, the plaintiff's claim fails to produce sufficient state action for the case to be cognizable under the Civil Rights Act.

The difficulty with this argument is that both its ingredients have been rejected by other courts.

■■ We proceed from the well-established principle that the receipt of Hill-Burton funds carries with it the obligation to observe Federal Constitutional mandates.[4] Disregard of these mandates constitutes state action, "for the act trusts the State to maintain a fair and just governance of [those] hospitals accepting the aid of the legislation. * * *" Sams v. Ohio Valley Gen'l Hosp. Ass'n, 413 F.2d 826, 828 (C.A.4, 1969). In *Sams* one of the defendant hospitals had constructed an addition costing $1,264,696, of which $625,-976 came from Hill-Burton funds. These figures are less than those involved in the case before us.

■■ Also rejected in *Sams* was the argument that the absence of any racial discrimination relegated the constitutional claims to less protection from the provisions of the Civil Rights Act:

"* * * While no race considerations exist here as were present in [Smith v. Hampton Training School, 360 F.2d 577 (4th Cir. 1964); Simkins v. Moses H. Cone Memorial Hosp., 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964)], the constitutional principles there announced apply

thereafter found not to be meritorious. *Compare* The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 33 S.Ct. 410, 57 L.Ed. 716 (1913), *and* Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), *with* United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *And see* Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). These authorities make clear that as long as the complaint cannot be said to state a plainly "insubstantial" claim, the district court is vested with jurisdiction and any later disposition is on the merits of the stated claim. Rosado v. Wyman, at 403 n. 3, 90 S.Ct. at 1213 n. 3 and cases there cited. *Accord*, Meredith v. Allen, etc., 397 F.2d 33, 35 (C.A.6, 1968).

2. Hospital Survey & Construction Act, 42 U.S.C.A. § 291 et seq. (Supp.1970). See 42 C.F.R. §§ 53.1, –.134. *See generally*, Simkins v. Moses H. Cone Memorial Hosp., 323 F.2d 959, 963–965 (C.A.4,

1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).

3. Defendants do not argue that simply because the Hospital terms a physician's use of the Hospital's facilities a "privilege" that a restriction of the privilege should receive any less protection under the Fourteenth Amendment. In not making this argument they have exercised sound judgment. Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *see* Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed. 287 n. 8, 9 (filed March 23, 1970).

4. Sams v. Ohio Valley Gen. Hosp., 413 F.2d 826 (C.A.4, 1969); Shulman v. Washington Hosp. Center, 121 U.S.App. D.C. 64, 348 F.2d 70 (C.A.4, 1965); Simkins v. Moses H. Cone Mem. Hosp., 323 F.2d 959 (C.A.4, 1963). *See* "The Physician's Right to Hospital Staff Membership: The Public-Private Dichotomy," Wash.L.Q. 485 (1966).

in full strength to the non-racial issues of this case." *Sams, supra,* 413 F.2d at 828.

The Civil Rights Act of 1871, 42 U.S.C.A. § 1983 (Supp.1970), protects " * * * any citizen of the United States * * * [from] the deprivation of any rights, privileges, or immunities secured by the Constitution and laws * * *." It is well settled that this section encompasses violations of the Due Process Clause of the Fourteenth Amendment as well as the Equal Protection Clause. Scher v. Board of Educ., 424 F.2d 741 (C.A.3, 1970), and cases cited at p. 744; Birnbaum v. Trussell, 371 F.2d 672, 676–679 (C.A.2, 1966). We hold that allegations constituting a denial of due process in the decision-making procedure by which a hospital recipient of Hill-Burton funds restricts the privileges of a physician practicing therein states a claim under the Civil Rights Act of 1871. Meredith v. Allen County War Memorial Hosp. Comm'n, 397 F.2d 33, 35–36 (C.A.6, 1968); Birnbaum v. Trussell, *supra,* 371 F.2d at 677–679.

We therefore conclude that we have jurisdiction of the subject matter, 28 U.S.C.A. § 1343(3), and proceed to the merits.

## B

Plaintiff initially attacks restriction of his privileges under the Due Process Clause of the Fourteenth Amendment. First he argues that the Hospital failed to give him notice of the reasons for restricting his privileges before it took that action, and that he did not have an opportunity to appear before either of the executive bodies which decided to uphold Dr. Mogul's action—the Executive Committee of the Department of Surgery which concurred in Dr. Mogul's decision after he contacted each member informally, and the Medical Executive Board which met on November 21, 1969.

It is true that the first formal notice given to the plaintiff as to why his surgical privileges were restricted was on January 13, 1970, after the instant action was filed and our first hearing held. It is also true that plaintiff was never given the opportunity to appear before the deliberative bodies that met on. November 10 and 21, 1969 and confirmed Dr. Mogul's decision to restrict his surgical privileges. However, these omissions are constitutionally significant only if plaintiff was entitled to a hearing on the restriction of his privileges *before* such action was taken. Since many of plaintiff's arguments fail if the Due Process Clause does not require a prior hearing, we address ourselves to that question now.

█ We think it is clear that the determination to restrict a physician's privileges is one which should be subject to an evidentiary hearing at some point in the administrative process.

"Facts pertaining to the parties and their activities, that is, adjudicative facts, are instrinsically the kind of facts that ordinarily ought not to be determined without giving the parties a chance to know and to meet any evidence that may be unfavorable to them, that is, without providing the parties an opportunity for trial. The parties know more about the facts concerning themselves and their activities than anyone else is likely to know, and the parties are therefore in an especially good position to rebut or explain evidence that bears upon adjudicative facts. * * *" K. C. Davis, The Requirement of a Trial-Type Hearing, 70 Harv.L.Rev. 193, 199 (1956).

The subject matter of the dispute here centers on the operative procedures employed by plaintiff in treating Gerald Maher. It is obvious that what actually occurred on the operating table, the patient's condition, what the surgeon observed and the reasons for the medical and surgical judgments made, are all matters determinable only by an investigation of their critical factual bases. The operating surgeon is in possession of almost all the facts necessary to evaluate the decisions he himself made. He is responsible for the "paper trail" of

the patient's treatment, the charts and other records prescribed by standard hospital procedure. All of the facts underlying his judgment must be known before his care of the patient can be evaluated with any certainty. We thus consider it a sensible postulate that before a surgeon's privileges are permanently restricted on the basis of what he did in any given instance, he must be given an opportunity to defend and explain his actions.

■ Such a premise, however, does not compel the conclusion that a hearing must be given *before* the restrictions are imposed. For in deciding these issues of procedural due process, we must determine the extent to which this plaintiff

"* * * may be 'condemned to suffer grievous loss,' Joint Anti-Fascist Refuge Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), and * * * whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. * * *" Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018 (1970).

And in deciding these issues, it is axiomatic that

"* * * consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the governmental function involved as well as of the private interest that has been affected by governmental action." Cafeteria & Restaurant Workers Union etc. v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

In the case before us, it is probable that the restriction of a physician's privileges redounds to his detriment in the eyes of other physicians who customarily refer patients to him for treatment and probably reduces his income. Nothing in this record, however, indicates that the restriction here has dealt a mortal blow to plaintiff's practice. Not only do gastrectomies constitute an extremely small part of plaintiff's practice, but their restriction constitutes another reduction of privileges in a long line of restrictions imposed not only on plaintiff but on all members of the Department of Surgery. There is no doubt, however, that a restriction imposed after one particular surgical operation by the plaintiff has a far greater impact upon his professional standing than those restrictions imposed across the board to all members of the department.

■ On the other hand, a hospital has an overwhelming interest in maintaining the highest standards of medical care for its patients. This interest stems not only from the practicalities of insurance coverage and the limitation of potential liability but also results from the undoubted concern of all professionals who administer the hospital's dispensing of services that they provide the finest possible care for all patients. Patient care and the administration of the procedures necessary to maintain high quality care is an extremely important interest. In balancing the physician's interest in preserving his professional reputation, we must assess the damage to his professional standing as relatively less significant where only one of his surgical privileges is restricted. Moreover, should questions concerning his operative procedures touch on the quality of the care his and the hospital's patients receive at his hands, we think that a hospital has ample justification for acting *before* extending a hearing to the physician.

"* * * In a wide variety of situations, it has long been recognized that where harm to the public is threatened, and the private interest infringed is reasonably deemed to be of less importance, an official body can take summary action pending a later hearing. * * *" R. A. Holman & Co. v. SEC, 112 U.S.App.D.C. 43, 299 F.2d 127, 131 (D.C.Cir.), cert. denied, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962).

*Accord* Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of misbranded vitamin product); North American Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (seizure of food reasonably found not fit for human use). *Compare* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011 (1970). Here, Dr. Mogul had observed Maher personally at an operation and as a result of what he observed decided that plaintiff should not be allowed to perform gastrectomies alone. We consider it appropriate for the Department head to have the power to restrict the privileges of physicians under his responsibility in the interest of securing the quality of patient care. These are, we think it not trite to say, matters of life and death, and the public interest is best served by striking the balance in this manner.

■ We therefore decide that a hospital may restrict a physician's privileges by summary action where the quality of the care rendered to the physician's patients has been called into question if the affected physician is given an adjudicatory hearing within a reasonable time after his privileges are restricted.[5]

■ Plaintiff does not argue that the Hospital waited too long before he was tendered a hearing, and in the circumstances of this case we do not consider that it did. All the parties to this controversy were unsure of what procedures were provided by the Hospital's By-Laws, and the celerity with which plaintiff proceeded to a judicial determination precluded any administrative disposition of the dispute before our first hearing. We therefore decide that the administrative procedure by which the Hospital restricted plaintiff's priv-

ileges without a prior hearing was consonant with Due Process.

Because we have resolved the issue in this fashion, we need not consider plaintiff's arguments that the Due Process Clause was violated by the actions and omissions of the Medical Executive Board. This additional administrative determination does not detract from the fact that the plaintiff was given a hearing within a reasonable time of the restriction of his privileges. *See* Birnbaum v. Trussell, 371 F.2d 672, 679–680 (C.A.2, 1966).

**C**

→ Plaintiff next argues that the hearing he did receive before the Corporate Staff also failed to pass muster under the Due Process Clause because: (1) Dr. Mogul was not an impartial presiding officer, (2) the question to be decided by the vote of the Corporate Staff was not a fair statement of the issue, and (3) counsel was prevented from delivering a summation on behalf of his client and was not permitted to keep present in the hearing room throughout the hearing several doctors who could have assisted him.

■ In resolving these contentions we proceed from well-settled principles. Due Process requirements for a fair hearing vary according to the circumstances and must be adapted to particular situations, Cafeteria & Restaurant Workers Union etc. v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed. 2d 1230 (1961); Hannah v. Larche, 363 U.S. 420, 422, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960); Joint Anti-Fascist Refuge Committee v. McGrath, 341 U.S. 123, 162, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), but the controlling principle is that the hearing must be meaningful, Armstrong v.

5. While the timing of the hearing required by Due Process is often not crucial, as in the case of a student's suspension from classes for a few days pending a hearing, Madera v. Board of Educ., 386 F.2d 778 (C.A.2, 1967), cert. denied, 390

U.S. 1028, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968), the situation has been viewed as very different when the suspension is permanent. Woods v. Wright, 334 F.2d 369 (C.A.5, 1964).

Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), which we understand to mean a hearing that affords a reasonable opportunity to correct error. Gonzales v. United States, 348 U.S. 407, 415, 75 S.Ct. 409, 99 L.Ed. 467 (1955). In other words, we must ascertain whether the procedures employed at the Corporate Staff hearing provided for " * * * the protection of the individual against arbitrary action * * *." Ohio Bell Tel. Co. v. Public Util. Comm., 301 U.S. 292, 302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937).

The safeguards extended to plaintiff at the Staff hearing were comprehensive. Because judicial review of the proceedings was contemplated a stenographic record of the hearing was arranged. *See* Kwock Jan Fat v. White, 253 U.S. 454, 464, 40 S.Ct. 566, 64 L.Ed. 1010 (1920). Plaintiff received a timely, written notification of the reasons for the restriction of his privileges which afforded him the opportunity to prepare his case. *See* 1 K. Davis, Administrative Law Treatise 525–526, 530 (1958). He personally appeared and testified on his own behalf at the hearing, *see* Dixon v. Alabama State Bd. of Educ., 294 F.2d 150, 159 (C.A.5), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), and was represented by counsel who was allowed to call witnesses on plaintiff's behalf and to cross-examine witnesses, a right vigorously exercised by counsel.[6] Finally, the Corporate Staff voted by secret ballot with no proxy ballots permitted, so that only Staff members who attended the hearing could vote. All these procedures ensured that the facts heard by the Staff were as close to the truth as the adversary process can ensure, and that the deliberative body was as free as possible from the subtle pressures of personality and institutional politics.

Bearing these facts in mind, we are confronted with plaintiff's assertion that Dr. Mogul was not an impartial presiding officer. The short answer to this argument is that our reading of the hearing transcript convinces us that Dr. Mogul conducted both evenings of lengthy testimony in a fair and reasonable manner, insofar as he *was* the presiding officer. For as the transcript makes clear, the course of the proceedings was actually determined by counsel for plaintiff and counsel for defendants. It is possible, however, that the thrust of plaintiff's argument is that because Dr. Mogul had initiated the restriction of plaintiff's privileges, he was not a proper party to conduct the hearings. It is, of course, true that a fair hearing has been presumed to be unavailable where the functions of investigating, prosecuting, and judging have been combined in a single person, and actual bias need not be shown. In re Murchison, 349 U.S. 133, 136–137, 75 S.Ct. 623, 99 L.Ed. 942 (1955); Wasson v. Trowbridge, 382 F.2d 807, 813 (C.A.2, 1967); *see* Amos Treat & Co. v. SEC, 113 U.S. App.D.C. 100, 306 F.2d 260, 263–267 (D.C. Cir. 1962); *cf.* Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). But this argument means that Dr. Mogul should not have been permitted to judge or decide the merits of plaintiff's case at the hearing, or more specifically, should not have been permitted to vote on the question before the Corporate Staff. This principle does not preclude Dr. Mogul from acting as the presiding officer absent a showing of actual prejudice. The record before us does not make clear whether Dr. Mogul actually did vote at the conclusion of the

---

6. It is often very difficult to decide when a hearing requires the assistance of counsel. *Compare* Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), *and* Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), *with* Anonymous Nos. 6 and 7 v. Baker, 360 U.S. 287, 79 S.Ct. 1157, 3 L.Ed.2d 1234 (1959), Madera v. Board of Educ., 386 F.2d 778 (C.A. 2, 1967), cert. denied, 390 U.S. 1028, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968), *and* Dixon v. Alabama State Bd. of Educ., 294 F.2d 150 (C.A. 5), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961).

Staff hearing as he was entitled to do under the Hospital's By-Laws. But in any event, even if his ballot should not have been counted and should now be disallowed, his ballot was not decisive. Therefore the fact that Dr. Mogul presided at the hearing did not deprive plaintiff of Due Process.

■ Plaintiff's second contention is that the framing of the question to be decided by the Corporate Staff—"Do you support the action of the Medical Executive Board?"—was really a "loaded" one, since the Staff was asked to review the decision of the administrative body which under section 10(a) of the Hospital's By-Laws, controls all promotions of Staff members. We construe this argument to mean that the Corporate Staff did not decide whether the decision to restrict the plaintiff's privileges was correct, but rather whether the staff considered it reasonable for the Board to have taken that action. Thus, plaintiff seems to say, all the Corporate Staff really decided was whether there was a reasonable basis for restricting plaintiff's privileges at the time that decision was made, not whether that restriction should be allowed to stand in light of all the facts known at the time of the Staff hearing. If the Corporate Staff really decided the former question, this case would pose serious constitutional issues about the extent to which plaintiff could be deprived of an adjudicatory hearing on the ultimate facts supporting the restriction of his privileges through the expedient of reducing his hearing to a kind of appellate review of the initial decision. It is clear, however, that the Corporate Staff decided the latter question.

In the first place, the fact that members of the Corporate Staff were asked to evaluate the decision of the body which controlled their promotions is of no significance where that evaluation is made by secret ballot. More importantly, the entire course of the hearing was clearly an inquiry into the question whether, on the facts as found by the Staff, restric-

tion of plaintiff's privileges was appropriate. All the testimony gathered in the eleven hour hearing focused on the actual extent of the gastrectomy performed by plaintiff on Gerald Maher, plaintiff's judgment in omitting to do a vagotomy, and the accuracy and completeness of the operative notes plaintiff entered concerning the entire operation. Thus, while the question posed to the Corporate Staff is subject to an interpretation which relegates the Staff to a reviewing function, the record establishes that the Staff's actual inquiry was whether continued restriction of plaintiff's privileges was proper under all the circumstances.

■ Finally, it is true that plaintiff's counsel was precluded from retaining in the hearing room several doctors who were not members of the Corporate Staff of the Hospital. However, these doctors could have been called as witnesses and two of them were in fact called. Defendants also kept their doctor-witnesses who were not members of the Staff out of the hearing room except when testifying. Plaintiff contends that counsel was prejudiced by his lack of ready access to the expertise of Dr. McCafferty, a consulting physician in the treatment of Gerald Maher. However, plaintiff's counsel has not cited to us any specific examples of prejudice and our reading of the transcript makes clear that counsel, one of the most eminently qualified attorneys in this area of the law, was thoroughly prepared for the hearing, represented plaintiff extremely well, and was not prejudiced by the absence of Dr. McCafferty.

■ As to counsel's inability to present closing argument to the Corporate Staff, it is also true that opposing counsel did not sum up either. We cannot say that after two evenings of medical testimony to a hospital staff of physicians that the barring of any summation by counsel constitutes a violation of Due Process where all the testimony was directed to the procedures employed in one operation and was within the gen-

eral professional expertise of the deliberative body. The hearing accorded plaintiff in this case was a fundamentally fair hearing, with procedures which did protect plaintiff "against [possibly] arbitrary action," Ohio Bell Tel. Co. v. Public Util. Comm., 301 U.S. 292, 302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937).

### D

■ Plaintiff's final argument is that there is not sufficient evidence in the record to support the restriction of his privileges, and that the decision to restrict them was therefore arbitrary and capricious. As we indicated in our formal findings, the Corporate Staff heard conflicting expert testimony concerning whether plaintiff removed a sufficient amount of Maher's stomach during his first operation, and whether he should have performed a vagotomy under the circumstances.[7] It was the function of the Corporate Staff hearing to resolve those conflicts in the testimony, and this court is not now in a position, either practically or legally, to resolve them. While the questions are not at all free from doubt, as is indicated by the large vote in plaintiff's favor, we are not free to substitute our judgment for that of the physicians and surgeons comprising the Corporate Staff of the Hospital. And because acceptance of the defendants' evidence provides sufficient evidence on which to base the decision to restrict plaintiff's privileges, the decision must be allowed to stand. See Koelling v. Board of Trustees, 259 Iowa 1185, 146 N.W.2d 284, 296–297 (1967).

### IV. CONCLUSIONS OF LAW

1. The complaint states a cause of action under 42 U.S.C.A. § 1983.

2. The court has jurisdiction of the parties and the subject matter, 28 U.S. C.A. § 1343(3), and pendent jurisdiction over the ancillary state law claim.

3. Under Article X, §§ 10(b), (c), (d), of the Hospital's By-Laws, the Medical Executive Board is empowered to review the decision of the Executive Committee of the Department of Surgery.

4. Under Article X, § 13, of the Hospital's By-Laws, the Medical Executive Board's decision was reviewable by the Corporate Staff of the Hospital.

5. The Hospital's By-Laws permit the Chairman of the Department of Surgery, Dr. Mogul, to evaluate and change the privileges of the Staff of the Department of Surgery, subject to review by the Medical Executive Board under Article X, § 10(b).

6. Due Process of Law was accorded plaintiff by the Hospital and by the defendants in deciding to restrict plaintiff's privileges.

Any factual references under "Discussion" shall be considered as our Findings of Fact in addition to those set forth under "Findings of Fact", *supra*, and any conclusions of law contained in "Discussion" shall be deemed our Conclusions of Law in addition to those set forth under "Conclusions of Law", *supra*.

### ORDER

And now, this 13th day of May 1970, it is ordered that plaintiff's request for a permanent injunction be and it hereby is denied and judgment is entered in favor of the defendants.

---

7. While there are other matters on which there is some dispute, we do not regard them as relevant to plaintiff's privilege to perform gastrectomies.