356 F.Supp. 500 (1973)
COMMONWEALTH OF PENNSYLVANIA ex rel. Linda RAFFERTY et al.
v.
PHILADELPHIA PSYCHIATRIC CENTER et al.
Civ. A. No. 72-2521.
United States District Court, E. D. Pennsylvania.
March 27, 1973.
*501 *502 Israel Packel, Atty. Gen., Lawrence Silver, Robert F. Nagel, Peter W. Brown, Deputy Attys. Gen., Commonwealth of Pennsylvania, Harrisburg, Pa., for plaintiffs.
Donald J. Swanick, Media, Pa., for plaintiff Linda Rafferty.
Samuel Moonblatt, Berk, Masino, Moonblatt & McDougall, Philadelphia, Pa., for defendants.
Lawrence S. Coburn, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for American Civil Liberties Foundation, amicus curiae.
F. Murray Bryan, McNees, Wallace & Nurick, Harrisburg, Pa., for Pennsylvania Nurses Association, amicus curiae.
Jerome H. Gerber, Handler, Gerber, Widmer & Weinstock, Harrisburg, Pa., for Pennsylvania State AFL-CIO, amicus curiae.

OPINION AND ORDER
JOSEPH S. LORD, III, Chief Judge.
This suit, brought pursuant to 42 U. S.C. §§ 1981 and 1983 and 28 U.S.C. §§ 1343, 2201 and 2202, alleges deprivations of constitutional rights in connection with the termination of plaintiff Linda Rafferty's employment at the Community Mental Health Center of the Philadelphia Psychiatric Center. In their complaint filed December 29, 1972, plaintiffs *503 ask for damages and injunctive relief, including Mrs. Rafferty's reinstatement. On January 16, 1973, plaintiffs filed motions for a preliminary injunction and for the immediate reinstatement of Mrs. Rafferty. A hearing was set for February 5, 1973, at which time the parties presented testimony as on final hearing.[1]

I.
Philadelphia Psychiatric Center ("PPC"), which is funded by various government grants and private gifts, is a comprehensive mental health facility with a number of research and clinical programs. One of its programs is the operation of a Community Mental Health Center ("CMHC") for a catchment area of approximately 200,000 people. Of CMHC's $2 million annual budget, something over $1.5 million comes from federal funds and from state funds administered by the City and County of Philadelphia. The salaries of CMHC employees are paid entirely out of public funds.[2] Although CMHC has its own budget, staff and Community Advisory Board, it is very much a creature of PPC. Its employees are hired by PPC for work at CMHC; the source of ultimate authority for its operations is a Joint Executive Committee composed of six members of CMHC's Community Advisory Board and six members of PPC's Board of Directors, and its financial affairs are overseen by defendant Einbinder, the Executive Director of PPC.
For five years, until August 1972, Linda Rafferty was a psychiatric nurse on the staff of Haverford State Hospital in Haverford, Pennsylvania. She became increasingly disturbed by conditions at Haverford which, in her opinion, violated accepted standards of sound medical and psychiatric practice. The conditions Mrs. Rafferty claims to have observed at Haverford include the staff's failure to protect patients from homosexual abuse by other patients and from sexual exploitation by outside workmen; improper non-psychiatric medical care; allowing patients to keep medication in their rooms; locking up fire extinguishers; leaving blank prescription forms, signed in advance by physicians, in unlocked drawers for nurses to fill out on weekends; and chronic absenteeism on the part of the hospital's medical staff. Mrs. Rafferty repeatedly complained to her superiors, but finally concluded that her protests were falling on deaf ears and resigned from Haverford on August 14, 1972.
Shortly thereafter she was hired to be Supervisor of Nurses at the in-patient unit of CMHC, at a salary of $10,500 per year. She began working there on August 28. Sometime before that date she had given an interview to a reporter for the Philadelphia Daily News in which she sharply criticized the treatment given to patients at Haverford State Hospital, focusing on the conditions we have just enumerated. On the afternoon of September 5, the Daily News published an article about Haverford based on the Rafferty interview.[3]
The next morning Mrs. Smith and Miss Oberlander, both nurses at CMHC, showed the article to Mr. Paul Lehman, who at the time was Director of Nurses at PPC,[4] and told him that they and other staff members were upset over the publication of the article. Mr. Lehman then discussed the situation with his superiors, including Mr. Einbinder and Dr. Murphy, and told them about his conversation with Mrs. Smith *504 and Miss Oberlander. Mr. Einbinder's immediate reaction was that Mrs. Rafferty had to be fired. Dr. Murphy, who until that time had never met Mrs. Rafferty and in fact was unaware that she had been hired, decided on the basis of a reading of the article and Mr. Lehman's reports of staff anxiety that Mrs. Rafferty would be discharged immediately.
Mr. Lehman returned to his office and summoned Mrs. Rafferty to tell her of Dr. Murphy's decision. Mrs. Rafferty asked Mr. Lehman if the decision could be reconsidered. When Mr. Lehman replied that the decision was final and that there was no possibility of reconsideration, Mrs. Rafferty left the Center, never again to return.
Since her dismissal, Mrs. Rafferty has been unable to obtain another job as a supervisor of psychiatric nurses or as a psychiatric nurse. For two and one-half months from October to December, 1972, she worked as a geriatric nurse in a nursing home at a salary of $9,600 per year. She has been unemployed for the rest of the period since her dismissal. Her actual wage loss to date is $3,687.50. She will continue to suffer losses of $213.75 per week until she is reinstated.
At the time of Mrs. Rafferty's discharge PPC had no formal grievance procedures.[5] The Joint Executive Committee, with Dr. Murphy present ex officio, met to discuss (perhaps among other topics of interest) the firing of Mrs. Rafferty.[6] At this meeting the Committee drew up formal grievance procedures which were published and apparently distributed to the employees the following day. The Committee also directed Dr. Murphy to contact Mrs. Rafferty and explain the newly adopted procedures to her. This he never did. The reason for his silence, according to his testimony, was that in spite of the Committee's explicit directive, he simply assumed that once a matter had reached the level of the Joint Executive Committee, it was out of his hands.
Nothing was done about Mrs. Rafferty until the Joint Executive Committee met again in early October. The Committee, apparently abandoning its faith in Dr. Murphy's skills as a messenger, instructed Mr. Frederick N. Sass, Chairman of the Personnel Committee of CMHC's Community Advisory Board, to write to Mrs. Rafferty about the remedies that had become available to her. He did so on October 17. In his letter he informed her that "avenues of appeal" were available to her and briefly outlined the new grievance mechanism. He instructed Mrs. Rafferty to notify him in writing within 15 days of her intention to avail herself of the appeal procedure and said that if he did not hear from her within 15 days, he would conclude that she did not "wish to pursue this matter any further." Mr. Sass gave his home and office telephone numbers and asked that Mrs. Rafferty call him if she had any questions.
Mrs. Rafferty never responded to the letter, either in writing or by calling one of Mr. Sass's telephone numbers. She contends that the letter was ambiguous and that she had no way of knowing it was an official communication from PPC. She testified that after the September 8 Daily News article about her firing, she received many letters from concerned private citizens, some of whom offered her assistance, and she simply assumed that Mr. Sass's letter *505 fell into this category. Mrs. Rafferty offered several reasons for this interpretation: the letter was typed on personal stationery, with only Mr. Sass's name on the letterhead; the stationery was a color other than the customary business white; the return address under the signature was Mr. Sass's home address rather than that of PPC or one of its satellites; and she had never heard of Mr. Sass nor of his connection with PPC. Although we found Mrs. Rafferty's testimony on this point less than entirely credible, or at least her reading of the letter not a reasonable one, our disposition of this case makes discussion of the letter and Mrs. Rafferty's reaction to it unnecessary. It is sufficient to note that she consulted with her husband and her attorney, chose to ignore the offer of an appeal, and continued with her plans to institute this lawsuit.

II.
The Commonwealth of Pennsylvania has sued the defendants on behalf of itself, including officials and employees in state-funded programs; citizens and residents of the Commonwealth who receive treatment for mental illness in facilities supported by the Commonwealth; and Linda Rafferty. It claims an interest in this matter because of its "affirmative obligation to protect free speech and assure the adequate flow of ideas and information including the flow of information critical of state or state-supported facilities for the mentally ill," as well as a statutory goal of providing adequate mental health services for all who need them. (Complaint, ¶ 3).
We find the Commonwealth's position unpersuasive. It is true that the doctrine of parens patriae has been broadened considerably since the days when it comprehended only the state's guardianship, as sovereign, of persons under legal disabilities to act for themselves. A state may now sue as parens patriae and recover damages for injuries to its "quasi-sovereign" interests, including harm to the health and welfare of its inhabitants. Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed. 2d 184 (1972); State of West Virginia v. Chas. Pfizer and Co., 440 F.2d 1079 (C.A.2, 1971); Note, State Protection of its Economy and Environment: Parens Patriae Suits for Damages, 6 Colum.J.L. & Soc. Prob. 411 (1970).
However, although to have standing as parens patriae a state need not be affected by the acts of the defendants in the same way that an individual plaintiff must be, it nevertheless must be able to show (i) that a substantial number of the state's inhabitants have been injured, and (ii) that the state's injury is somehow separate and distinct from the injury to the individual plaintiff. Note, 18 Vill.L.Rev. 79 (1972). We think the Commonwealth has shown neither here.
Any chilling of any individual's freedom of speech is bound to result in pernicious side effects, including an increased timidity on the part of other persons in similar positions and a decrease in the flow of certain kinds of information or opinion. This is one of the many reasons why any deprivation of rights guaranteed by the First Amendment must be carefully scrutinized and quickly remedied. However, merely because more than one Pennsylvanian may have been indirectly affected by Mrs. Rafferty's firing does not mean that Mrs. Rafferty's injury is an injury to all. Deprivations of an individual's First Amendment rights, whatever the secondary consequences, normally constitute an injury only to the individual. Neither existing law nor sound policy justifies viewing the deprivation of one person's freedom of expression as a fortiori a deprivation of the constitutional rights of the citizenry at large.
There was testimony at the hearing to the effect that the Department of Welfare, which is charged with the operation of the Commonwealth's mental health programs, is affected by newspaper articles and publicity concerning *506 state-funded programs and facilities.[7] We assume this to be true, just as we may assume that the Department's decision-making process is also influenced by a host of other factors. However, we do not accept the Commonwealth's argument that its desire for a free flow of information critical of state-operated mental health programs is a quasi-sovereign interest which may properly be asserted in a parens patriae action.
In support of its contention, the Commonwealth refers us to Commonwealth of Pennsylvania v. Brown, 260 F.Supp. 323 (E.D.Pa.1966) and Gibbs v. Titleman, (Civil No. 72-2165, E.D.Pa. Jan. 9, 1973). In Brown we determined, inter alia, that the Commonwealth had standing to sue as parens patriae because the education of its citizens is a state function of paramount importance, and therefore "a state has a sufficient interest in the elimination of discrimination for which it would be responsible to enable it to maintain an action in federal court." 260 F.Supp. at 338. In Gibbs, the Commonwealth was granted leave to intervene in an action attacking the constitutionality of the Pennsylvania statutory scheme of non-consensual repossession of motor vehicles. The Commonwealth's interest in each of these cases was direct, immediate and readily distinguishable from that of the individual plaintiffs. The public interest claimed here is in comparison vague, speculative and remote, too remote to be encompassed by the doctrine of parens patriae.
Since we have concluded that the injury here was to Mrs. Rafferty alone and that the Commonwealth has no separate interest in this matter which may be protected by suing as parens patriae, the Commonwealth will be dismissed for lack of standing to sue.

III.
There can be no doubt that the firing of Linda Rafferty constituted "state action" for Fourteenth Amendment purposes. The extensive support PPC and its Community Mental Health Center receive from government funds and the extensive governmental regulation that travels with the money make its action "state action." Sams v. Ohio Valley General Hospital Association, 413 F.2d 826 (C.A.4, 1969); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (C.A.4, 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964); Holmes v. Silver Cross Hospital, 340 F.Supp. 125 (N.D.Ill.1972); Citta v. Delaware Valley Hospital, 313 F. Supp. 301 (E.D.Pa.1970). And conduct which is state action under the Fourteenth Amendment is under "color of law" for a § 1983 claim. "In cases under § 1983, `under color' of law has consistently been treated as the same thing as the `state action' required under the Fourteenth Amendment." United States v. Price, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966). Defendants' arguments to the contrary do nothing to refute these settled principles.

IV.
Defendants have asserted two reasons for Mrs. Rafferty's discharge: (1) inadequate performance of her job duties and (2) "staff anxiety" caused by the publication of the September 5 Daily News article.
We think it clear that Mrs. Rafferty was not fired for incompetence or for failure to do what was required of her at PPC. In their answer to the complaint, sworn to by defendant Einbinder, defendants state that "immediately upon assuming her duties as Supervisor of Nurses, plaintiff Rafferty totally and completely refused to follow the direction of the Director of Nursing, notified all their [sic] employees that should ignore the direction and requirements of the Director of Nursing, and *507 that she as Supervisor of Nurses was in sole charge." (Answer, ¶ 16). However, at the hearing, Director of Nursing Lehman, Nurses Smith and Oberlander and even Mr. Einbinder himself directly denied that Mrs. Rafferty had ever told the staff to ignore Mr. Lehman or said that she was in sole charge. Mr. Lehman also testified that Mrs. Rafferty had never ignored or refused to follow his directions.
There was some testimony to the effect that Mrs. Rafferty was often late for work and kept irregular hours at the Center. Mr. Lehman testified that he had told Mrs. Rafferty that she was responsible for round-the-clock supervision of the three shifts of nurses at the inpatient unit, and therefore she could choose her working hours each day in a manner that would put her in contact with each of the three shifts. This plan, by giving her the power to make her own hours, made it almost by definition impossible for Mrs. Rafferty ever to be late. The irregularity of Mrs. Rafferty's hours was clearly sanctioned by Mr. Lehman's instructions. The nurses apparently were unaware of the arrangement during the first week and complained to Mr. Lehman, who asked Mrs. Rafferty to begin posting a schedule of her hours. She did so for what was to have been her second week.
Nurse Oberlander testified that Mrs. Rafferty showed insufficient interest during her first week in giving or supervising the administration of medication, in getting to know her subordinates, or in dealing with the patients. Since Miss Oberlander was unable to oversee all of Mrs. Rafferty's activities during her brief period of employment, we give little weight to her testimony. However, even if Mrs. Rafferty was guilty of these apparent shortcomings, we conclude that they were the result of her need to become familiar with the responsibilities of a new administrative job and not indications of incompetence.
We find the allegations of inadequate performance afterthoughts to justify the firing rather than reasons for it.
Defendants' primary explanation for the decision to fire Mrs. Rafferty is that the article about Haverford State Hospital resulted in a great deal of "staff anxiety" at PPC which, according to Dr. Murphy's testimony, created an "anti-therapeutic situation" in the in-patient unit because the staff's anxiety would be felt by the patients. Dr. Murphy concluded that this situation could not be dealt with through group discussions or the passage of time and therefore that Mrs. Rafferty had to be excised immediately from the staff.
A public employer may not, as a condition of employment, require an employee to surrender all First Amendment rights he would otherwise possess. Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). This does not mean that a public employee may never be restricted in his freedom to comment on public issues if his comments adversely affect an important interest of his employer.
"The problem in any case is to arrive at a balance between the interest of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."
Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).
It can hardly be doubted that conditions at a state mental hospital are matters of considerable public concern on which citizens, including former employees of the hospital, would ordinarily have the right to comment freely. And it is equally clear that defendants' interest in allaying the anxieties of some of their employees is, under the Pickering balancing test, totally insufficient to outweigh Mrs. Rafferty's interest in *508 speaking freely about Haverford State Hospital.
The testimony of the defendants and their two nurse-witnesses suggested that the anxiety sprang from a fear that Mrs. Rafferty would, in Nurse Oberlander's words, "spy on us, too." We are not fully convinced that the staff was thrown into the fit of neurotic frenzy that defendants have tried to depict. However, even if we assume that some members of the PPC staff were upset at the appearance of the article about Haverford, their anxiety is not an acceptable reason for firing Mrs. Rafferty. There was no credible testimony to support Dr. Murphy's conclusory allegation that publication of the article and the staff's consequent anxiety would adversely affect patient care. Nor was there any showing that Mrs. Rafferty's statements to the press about Haverford and the staff reaction to her comments would have interfered with Mrs. Rafferty's performance of her daily duties at PPC. See Donahue v. Staunton, 471 F.2d 475 (1972), petition for cert. denied 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973). Nor was it demonstrated that Mrs. Rafferty's statements had destroyed staff harmony and discipline, or that whatever temporary furor may have been created by the article could not have been readily remedied by discussions and meetings. Compare Lefcourt v. Legal Aid Society, 312 F.Supp. 1105 (S.D.N.Y.1970). If defendants and their staff were upset, it was because they were uneasy about having in their midst an outspoken, forthright person who had aired her grievances against her former employer in what they regarded as an unprofessional manner. Their anxiety was caused, in other words, by their proximity to a person who was engaging in precisely the sort of free and vigorous expression that the First Amendment was designed to protect. Whitney v. California, 274 U.S. 357, 375-377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring), and perhaps by their fear that she might do so again.
The First Amendment does not stop at the hospital door. A hospital should be given every possible latitude in maintaining a proper environment for the treatment of its patients. It may not, however, be permitted to mask its arbitrary suppression of protected speech behind claims that such speech creates an "anti-therapeutic situation" when no ill effect on patient care has been shown. It may not stifle one employee's freedom of expression by professing a duty to create a sterilized, anxiety-free vacuum for its other employees, all of whom should by training be able to weather minor upsets without totally disintegrating.[8] Free speech may create tumult; it may offend some of its hearers. Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). It may also create "staff anxiety." However, staff anxiety over working with someone who is critical and outspoken, who adds to the dialogue that the First Amendment was designed to foster and protect, is no reason for firing a public employee for exercising her First Amendment rights.
"* * * [E]ven though a person has no `right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not act. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interestsespecially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected *509 speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. * * * Such interference with constitutional rights is impermissible."
Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).
We conclude that plaintiff Rafferty was fired solely because of her published statements in the Philadelphia Daily News and that defendants thereby infringed rights guaranteed her under the First Amendment.

V.
We have concluded that a hearing before plaintiff's discharge was an essential element of procedural due process in this case, and that defendants' failure to provide such a hearing deprived plaintiff of her Fourteenth Amendment rights.[9]
Plaintiff's job was not a form of largesse which could be arbitrarily taken away at the whim of the defendants. It was an interest which is afforded the protections of procedural due process. The Supreme Court recently identified "[c]ertain attributes of `property' interests protected by procedural due process":
"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims."
Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L. Ed.2d 548 (1972).
We can think of no better description of Mrs. Rafferty's interest in her job at PPC.[10]
The precise requirements of procedural due process are of necessity flexible and must be tailored to the circumstances of each case or class of cases. Cafeteria & Restaurant Workers etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (Frankfurter, J., concurring) (1951). But it is firmly established that before a person may be deprived of a protected interest, he or she must be given a fair hearing appropriate to the particular circumstances of the case, "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." Boddie v. Connecticut, 401 U.S. 371, 379, 91 S. Ct. 780, 786, 28 L.Ed.2d 113 (1971); Bell v. Burson, 402 U.S. 535, 542, 91 S. Ct. 1586, 29 L.Ed.2d 90 (1971). The reasons for requiring a prior hearing in all but "rare and extraordinary situations," Board of Regents v. Roth, 408 U.S. at 570, n. 7, 92 S.Ct. 2701, 33 L. Ed.2d 548, are clear:
"If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly *510 taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred. `This Court has not . . embraced the general proposition that a wrong may be done if it can be undone.' [Citation omitted]."
Fuentes v. Shevin, 407 U.S. 67, 81-82, 92 S.Ct. 1983, 1994-1995, 32 L.Ed.2d 556 (1972).
To determine whether a hearing is required before an employee's discharge from a publicly supported institution, a court must weigh the institution's interest in summary dismissal against the "grievous loss" the employee may suffer, Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. at 168, 71 S.Ct. 624, and the employee's interest in avoiding that loss. The test is a strict one: a pre-discharge hearing is constitutionally dispensable only if the employer's interest is important and significantly outweighs the possible injury to the employee's interests. Grausam v. Murphey, 448 F.2d 197, 207 (C.A.3, 1971); Citta v. Delaware Valley Hospital, 313 F.Supp. 301, 309-310 (E.D. Pa.1970). See Goldberg v. Kelly, 397 U.S. 254, 262-263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969).
We are extremely reluctant to second-guess a psychiatric hospital's judgment that a medical necessity required summary dismissal, or to pass on its determination that patient care would suffer from even the short delay normally required to conduct a full hearing before dismissal. As we said in Citta v. Delaware Valley Hospital:
"[A] hospital has an overwhelming interest in maintaining the highest standards of medical care for its patients. This interest stems not only from the practicalities of insurance coverage and the limitation of potential liability but also results from the undoubted concern of all professionals who administer the hospital's dispensing of services that they provide the finest possible care for all patients. Patient care and the administration of the procedures necessary to maintain high quality care is an extremely important interest."
313 F.Supp. at 309.
However, although medical administrators must be given a very wide range of discretion, they are not immune from the mandates of the Due Process Clause. Even giving more than due deference to defendants' need to act quickly to protect their patients from harm, we find here that the scales of the balance tip overwhelmingly in favor of Mrs. Rafferty's interest in a hearing before discharge.
As we have already seen, defendants fired Mrs. Rafferty not, as they claim, to preserve a proper therapeutic environment, but because they wanted to rid themselves of an outspoken employee and to allay the personal uneasiness of some of their staff members. This, for all the protestations of medical necessity, was the sum and substance of defendants' interest in summarily dismissing Mrs. Rafferty.
Against this must be weighed the interests of the plaintiff in avoiding the loss of her job and the consequent injuries of such a loss. Her most obvious interest was in avoiding the withdrawal of her means of livelihood. Courts have been especially reluctant to relax the requirements of procedural due process when a loss of the means of support is threatened. Bell v. Burson, supra, 402 U.S. at 539, 91 S.Ct. 1586; Sniadach v. Family Finance Corp., 395 U.S. 337, 339, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Goldberg v. Kelly, supra, 397 U.S. at 264, 90 S.Ct. 1011.
Mrs. Rafferty also had a very real interest in avoiding damage to her professional reputation. It seems obvious that the summary firing of a psychiatric nurse, effective immediately, would have a major effect on her reputation as a capable psychiatric nurse and major consequences for her professional career. *511 See Lafferty v. Carter, 310 F.Supp. 465 (W.D.Wis.1970). The circumstances of her firing did in fact stigmatize her in the nursing community. Mrs. Rafferty testified that after many fruitless attempts at finding a new position as a psychiatric nurse or supervisor of nurses, she had a friend call the same institutions that had told her that they had no openings. Her friend testified that she gave the institutions her own name and Mrs. Rafferty's credentials; five said they had openings and some were quite anxious to have her apply. The circumstances of Mrs. Rafferty's sudden discharge, suggesting as they did improper conduct, "imposed on [her] a stigma or other disability that foreclosed [her] freedom to take advantage of other employment opportunites." Board of Regents v. Roth, supra, 408 U.S. at p. 573, 92 S.Ct. at p. 2707.
Plaintiff had a third, and extremely important, interest in having a prior hearing. She was fired in retaliation for engaging in protected speech and would clearly have wanted to avoid any infringement or chilling of her First Amendment rights. We need not reiterate the overriding importance of this interest, other than to say that if an employee is to be fired for reasons touching on the free exercise of her First Amendment rights, the requirements of procedural due process are stringent indeed.
This case is quite unlike those in which courts have struck the balance of interests in favor of a hospital-defendant and determined that a hearing before dismissal was not essential. For example, in Grausam v. Murphey, supra, the Court held that a probationary employee's interest in his job was too tenuous to outweigh a tuberculosis hospital's important interest in having qualified employees, and therefore a hearing before the plaintiff's discharge was not required.[11] In Citta v. Delaware Valley Hospital, supra, we determined that a hospital's interest in summarily revoking a physician's privilege to perform one type of operation"matters of life and death," 313 F.Supp. at 310was so much more significant than the possible harm that might be visited on the physician that it was not necessary for the hospital to hold a hearing before revoking his privileges. Here, PPC's interest in summary dismissal is far less important than the hospitals' interests in Grausam and Citta and the harm threatened to the plaintiff's interests much greater. The balance tips the other way and we conclude that defendants had no overriding interest which could justify their failure to give plaintiff a hearing before her discharge.
The foregoing shall constitute our findings of fact and conclusions of law under F.R.Civ.P. 52(a).

ORDER
And now, this 27th day of March, 1973, it is Ordered as follows:
1. Defendants shall reinstate plaintiff Rafferty as Supervisor of Nurses in the in-patient unit of the Community Mental Health Center or in a position at Philadelphia Psychiatric Center of equal rank and pay.
2. Defendants shall pay plaintiff Rafferty the amount of Three Thousand, Six Hundred Eighty-Seven and 50/100 Dollars ($3,687.50) in back wages and Two Hundred Thirteen and 75/100 Dollars ($213.75) per week until reinstatement.
3. Defendants are hereby Enjoined from interfering in any way with plaintiff's exercise of her First Amendment rights.

ORDER
And now, this 28th day of March, 1973, it is Ordered that the Order of March *512 27, 1973 be amended to add the following:
4. The Commonwealth of Pennsylvania is hereby Dismissed as a plaintiff.
NOTES
[1] Neither side has ordered a transcript of the four-day proceedings. We therefore rely on our own notes and recollection.
[2] This approximate budgetary information is culled from the confusing testimony of defendant Einbinder and from grant approval forms of which we have been able to make little sense.
[3] "Drug, Sex Charges Leveled at Hospital," Philadelphia Daily News, Tuesday, September 5, 1972 (Plaintiffs' Exhibit #1).
[4] Mr. Lehman was originally named as a defendant but, because he is no longer an employee of PPC, he was dismissed at the start of the hearing.
[5] Mr. Einbinder testified that after an August site visit federal regulations required that grievance procedures be promulgated in the near future, and that a general policy of establishing an internal appeals mechanism was orally announced at a small staff meeting in August. However, Mrs. Rafferty was not employed by PPC at the time of the meeting and it is clear that she had at no time before her dismissal received the slightest hint that PPC contemplated a formal mechanism for hearing employee grievances.
[6] We note that on September 8 the Daily News had published an article about the firing ("Nurse Fired for Criticizing Center," Plaintiffs' Exhibit #2) and on September 9 had run a critical editorial "Fired Under Pressure," Plaintiffs' Exhibit #4).
[7] Testimony of Mr. Bruce Fessenden, Chief of Program Implementation Unit, Office of the Deputy Secretary for Mental Health and Medical Programs, Department of Welfare.
[8] It may well be asked whether a mass anxiety neurosis of the staff after minimal exposure to criticism of a completely different institution and a contemporaneous conclusion by the Director of diminished therapeutic efficiency would not qualify the staff and the Director for commitment and treatment rather than supervision and direction.
[9] We therefore find it unnecessary to discuss the parties' contentions concerning the effect of defendants' long delay in notifying Mrs. Rafferty of their newly adopted appeals procedures or the reasonableness of plaintiff's failure to respond.
[10] Mrs. Rafferty was hired without any limitation of time. Her position is quite unlike that of the respondent in Roth, whose employment by the terms of his teaching appointment was to terminate at the end of the academic year, and whose desire for re-employment was held by the Court not to be an interest protected by the Fourteenth Amendment.
[11] There were also allegations of incompetence and improper conduct which were believed by the District Court and accepted as true by the Court of Appeals.