**James E. SAMS, Jack L. Paradise, and Daniel J. Birmingham, Appellants,**

**v.**

**OHIO VALLEY GENERAL HOSPITAL ASSOCIATION, a Corporation, et al., Appellees.**

**No. 12983.**

United States Court of Appeals Fourth Circuit.

Argued April 9, 1969.

Decided July 18, 1969.

Jeremy C. McCamic, Wheeling, W. Va., (McCamic & McCamic, Wheeling, W. Va., on the brief) for appellants.

John D. Phillips and D. Paul Camilletti, Wheeling, W. Va., (Chester R. Hubbard, II, Wheeling, W. Va., on the brief) for appellees.

Before HAYNSWORTH, Chief Judge, and BRYAN and WINTER, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Appellants are three physicians who have been refused staff appointments and enjoyment of privileges in two hospitals in Wheeling, Ohio County, West Virginia, under a common rule:

> "Except under extraordinary circumstances, physicians having their offices and practice outside of Ohio County shall not be eligible for staff appointment or hospital privileges."

The two institutions are the Ohio Valley General Hospital and the Wheeling Hospital. With their respective administrators individually, they were sued in the District Court by the appellants for injunction of this exclusion.

The Court dismissed, rejecting plaintiffs' premise of the suit—denial of the equal protection assured by the 14th Amendment [1]—and they appeal. The record requires us to reverse.

A constitutional right of admission to the staff and hospital privileges is disavowed by the plaintiffs. They claim only that the rule in suit is unjustly discriminative, for without semblance of reason for the differentiation, these hospitals accord full participation to doctors with offices and practices within Ohio County but refuse the same entitlement to those not so classifiable. We find the contention sound, a justified invocation of the Fourteenth Amendment's equal protection safeguards.

The facts are virtually agreed. Ohio Valley General and Wheeling are privately operated, non-profit hospitals, licensed by the State of West Virginia and governed by lay boards. Located in the city of Wheeling, Ohio County, they serve an area population of over 250,000, encompassing six counties besides Ohio County. One is Green located in Pennsylvania, three more are Jefferson, Belmont and Monroe lying in a north and south tier in Ohio on the west bank of the Ohio River, and the remaining two are Marshall and Brooke, West Virginia counties, in line with Ohio County along the east bank of the River, opposite the Ohio counties.

There are a total of six hospitals in the area, but Ohio Valley General and the Wheeling Hospital are the only ones in Ohio County. None of the other four have the sophisticated facilities found at these two. Ohio Valley General is the largest in the service area. Residents of Ohio County, West Virginia, constitute between 44 and 49% of the patient population in both hospitals.

Ohio Valley General Hospital applied for and received $3,352,755 of Federal moneys known as Hill-Burton funds to assist the construction of a new addition at a total cost of $9,863,758. A new wing at Wheeling Hospital costing $1,264,696 was paid for with the use of $625,976 in similar funds. In both instances, private contributions from Ohio County accounted for an appreciable part of the remainder of the cost.

The Hill-Burton Act [2] provides Federal grants to State agencies to assist in

---

1. The assurances of the Civil Rights Act, 42 U.S.C. § 1981, are also pleaded.

2. Hospital Survey and Construction Act, 60 Stat. 1041 (1946), as amended, 42

establishing or enlarging hospital facilities. Under it, a participating State must present a statewide plan to the Surgeon General of the United States comporting with the directives of the act and his regulations. This West Virginia did, in full acceptance of the Federal act. Recipients of Hill-Burton funds must also comply with minimum standards of maintenance and operation, including requisites for staff membership; the State must see to their obedience.

Each of the appellant physicians is a certified specialist, licensed by the State of West Virginia with offices in Bellaire, Belmont County, Ohio, which is immediately opposite Wheeling on the river. Dr. Paradise, a pediatrician, and Dr. Birmingham, a surgeon, reside in Ohio; Dr. Sams, an obstetrician and gynecologist, in West Virginia within Ohio County. With other physicians and surgeons they are members of J. L. Paradise, M. D. & Associates, Bellaire Medical Group, Inc., a professional corporation chartered in Ohio. It is operated on a prepayment plan, with compensation fixed by an annual or monthly charge rather than the traditional per-service fee. With three clinics, their patient lists cover almost the identical geographical range of the defendant hospitals. However, the plaintiffs are not equipped with facilities for specialization matching those of the hospitals. Confessedly, the rule in controversy has been and is hurtful to appellants' practice.

█ Substantial Federal moneys invited and flowing into the defendant hospitals under the Hill-Burton Act entail, in return, obligations of observance of Federal constitutional mandates. Disregard of them is State action, for the act trusts the State to maintain a fair and just governance of these hospitals accepting the aid of the legislation. These are axioms of ready verification.

Vide: Smith v. Hampton Training School for Nurses, 360 F.2d 577 (4 Cir. 1964); Simkins v. Moses H. Cone Memorial Hospital, supra, 323 F.2d 959 (4 Cir. 1963), cert den. 376 U.S. 938, 84 S. Ct. 793. While no race considerations exist here as were present in the decisions just cited, the constitutional principles there announced apply in full strength to the non-racial issues of this case.

█ The District Judge here demonstrated full and thorough awareness of these precepts. The only departure between his conclusion and ours is in respect to the reasonableness of the litigated rule. He saw it acceptable in law; we do not. Altogether correctly, his premise was that the Equal Protection Clause does not censure a State for allowing privileges to one group of persons while declining them to others, where the segregation of benefits has a reasonable purpose and embodies a reasonable means of achievement. McGowan v. Maryland, 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); Morey v. Doud, 354 U.S. 457, 465, 77 S. Ct. 1344, 1 L.Ed.2d 1485 (1957). This is familiar law, too commonplace to call for more than repetition of the Chief Justice's terse and pat etching of it in *McGowan,* supra:

"Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some

U.S.C. § 291 et seq. See also 42 CFR 53.1–53.134. In 1949, West Virginia elected to participate in this Federal program and, to that end, enacted implementing legislation. W.Va.Code § 16–1–15, as amended. A detailed description

of the Federal act and its operation is found in the opinion of Judge Sobeloff in Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959, 963–965 (4 Cir. 1963), cert. den. 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659.

inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

Illustrative of this doctrine are the holdings that if there is a rational basis therefor, separate treatment of professionals even of the same calling is permissible. For instance, finding ground for the difference in standings at the bar, the Court refused to strike down, upon the Equal Protection Clause, Kansas' denial of a resident and licensed attorney's right to practice, without a Kansas associate, in her courts because, although having an office in Kansas, he practiced regularly in Missouri. Martin v. Walton, 368 U.S. 25, 82 S.Ct. 1, 7 L. Ed.2d 5 (1961). More apt, perhaps, is Hayman v. City of Galveston, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927). There upheld was a regulation excluding osteopaths from practicing in a State maintained hospital which was reserved for teaching medical students in the university of the State.

█ In trying a State regulation on the Fourteenth Amendment, however, the fit is determined by measurements of "practical considerations based on experience rather than by theoretical inconsistencies". Railway Express Agency v. New York, 336 U.S. 106, 110, 69 S.Ct. 463, 93 L.Ed. 533 (1949). The constant determinant, however, of survival or annulment of the State action is the soundness of its basis.

█ Arraigned on these criteria, the eligibility rule now before us is a classification without rationality of doctors who may receive staff appointment or have hospital privileges. Constitutionally it is frivolous. No circumstance has been offered to establish it as legally wholesome or healthsome.

Seen at once as objectionable is the disqualifying factor of extra Ohio County "offices and practices". Even residents within this preferred county are not excepted from the ban, as witness appellant Dr. Sams with his home there. When the county line runs down a public thoroughfare, doctors may be unacceptable because they live on the wrong side of the street. Removal of an office from the county may recall a current eligibility. Obviously, the requirements may be easily evaded by the plaintiffs through the rental of an office in Ohio County, for their practice already embraces the whole of it.

Notwithstanding its manifest frailties, the regulation has grave consequences. It excludes a "foreign" doctor from attending patients in either hospital, though they be residents of Ohio County, because he is not only forbidden staff appointment but also hospital privileges. To avoid this embarrassment, he is forced to refer the case to a colleague whose only additional accomplishment, presumably, is the possession of a waiting or consulting room in Ohio County. While nonsensical, it is all nevertheless damaging.

Further, the plaintiffs are forced to place their Ohio County patients in hospitals situate out of the vicinage of the ill persons. Thus, not alone appellant doctors but as well the inhabitants of Ohio County are disserved by this rule. This thought discloses an especially nocuous aspect: hospitals sponsored by the Federal and State government for the public generally have voluntarily curtailed the fulfillment of this goal. No relief is available through the "extraordinary circumstances" of the rule, for the term is undefined. It has been utilized on occasion to admit practitioners of communities having no hospitals.

Besides lacking in reason, the regulation makes unjust distinctions between medical men. Those with offices in Ohio County are, in effect, rated above those in other counties, and quite groundlessly, it would seem. The impression upon the patients and the public hardly enhances the reputation of the unaccepted doctor.

Evidently, underlying the rule is a desire to give Ohio County citizens an advantage in access to the hospitals, because largely their initiative and their generosity brought the institutions into

being. Undoubtedly it was hoped, also, that by this means the County could attract and retain for its people, to be theirs primarily, enjoyment of immediate medical and surgical skill and hospitalization. To this end, the conception envisaged a limitation on the number of patients from the outside, and these considerations generated the restriction of staff and hospital privileges to doctors having offices in the County. It is not an unworthy object, but we cannot accede to it as justification for the rule in question. As pointed to already, its terms fail as too parochial and its enforcement engenders impermissible discrimination.

Not for a moment do we imply any absence of authority in hospital administrations to regulate staff appointments and hospital privileges. Too numerous to list now, concededly many considerations are involved in determining admissibility for engagement in the many segments of institutional operations. Presently, we enjoin enforcement of the disputed rule simply because it unfairly slants against the plaintiffs.

In remand, we will ask the District Court to vacate its order of dismissal and to decree injunction of the hospitals' exclusion of the plaintiffs.[3]

Reversed and remanded.

HAYNSWORTH, Chief Judge (dissenting):

I dissent.

There is no difference between us as to the governing legal principles. What divides us is our appraisal of the rationality of the classification, my view being that the majority fails to accord weight to considerations which were permissibly and appropriately taken into account.

If one approaches the problem solely in terms of the impact of the classification upon medical practitioners in the multi-county area or begins with the premise that the exclusive interest of the contributors of the capital funds with which the hospitals were constructed and equipped was the provision of those physical facilities in Ohio County, one would come to the conclusion my brothers reach, but I submit that the approach is far too narrow and the premise insupportable. The people of Ohio County were entitled to consider many other things than the economic and other interests of medical practitioners, and to aspire to more than the construction within Ohio County of buildings suitable for the care of the sick. The provision of adequate medical services encompasses much more than brick and mortar, and those who stand the economic burden of construction of the physical facilities as a step in the achievement of their ultimate purpose are entitled to claim the ancillary benefits their contributions were intended to provide.

The majority recognizes, as the record clearly shows, that, except for federal contributions through the Hill-Burton program, these hospitals were constructed and built with capital funds contributed by the citizens of Ohio County, West Virginia. Contributors from other counties in West Virginia and in Ohio were few and insubstantial. The situation is not substantially different than it would have been if the hospitals' construction and operation had been financed out of public funds of Ohio County raised out of general or special taxes imposed upon the citizens of Ohio County or on real estate or other property located in that county.

Why do citizens of a county voluntarily agree to approve bond issues and to tax themselves or otherwise to contribute funds for the construction of hospitals? It seems to me obvious that they have much more in mind than the erection of buildings, for their ultimate interest obviously is the provision for themselves of medical services which they believe desirable. This includes, of course, the presence of medical practi-

---

3. Other defenses of the appellees, such as the plea of res judicata and of no juris-

diction in the Federal court, have been considered and found to be insubstantial.

tioners with a much greater variety of specialists with greater skills than could be found in a rural community or an urban community with less adequate physical facilities. The construction of sophisticated physical facilities tends to attract the kind of doctors whose presence in the community is necessary to provide the kind of medical services the people seek. In a community of the size of Wheeling, West Virginia, that purpose is still further served if the physical facilities contain beds enough to serve patients from surrounding counties. The larger the hospital the more economic are special laboratory and other facilities, and the greater the number of patients and the variety of their illnesses, the greater is the attraction for medical specialists. The fact, therefore, that the people of Ohio County built physical facilities beyond their own immediate needs for hospital beds is no indication that they intended to confer gratuitous benefits upon the non-contributing people of other counties in Ohio and West Virginia or to dilute the ancillary benefits the people of Ohio County, by their contributions, undertook to provide for themselves. That the hospitals as constructed had a wider "service area" than Ohio County is simply a collateral result of the steps taken by Ohio County citizens to secure for themselves the kind and quality of medical services they wanted.

If the purposes of the contributors of the funds with which the hospitals were built and equipped are to be realized, it is essential that the specialists and other medical practitioners they sought, by their financial contributions, to attract be readily available for the care and treatment of the residents of Ohio County. Specialists in another county in another state presumptively would be primarily concerned with the care and treatment of persons in that county, not the residents of Ohio County. Broad extension of staff or hospital privileges to non-resident doctors inevitably would dilute the advantage the people of Ohio County, West Virginia, sought and undertook to provide for themselves. Because the hospitals must limit by some method the number of doctors to whom staff privileges may be extended, the residents of Ohio County may lose their ability to guarantee staff privileges to doctors whom they are attempting to persuade to practice in their county. Furthermore, there may be a real risk that the facilities of these two hospitals may become overtaxed if the rule is abrogated, for out-of-county doctors will not only continue to send their patients who need specialized treatment to these hospitals but may also choose to send all of their patients there once they have obtained staff or hospital privileges.

For such reasons I think the regulations had a thoroughly rational basis. They had a particular appropriateness springing from recognition that the people of Ohio County are entitled to the enjoyment of the benefits flowing naturally from the contributions they made and the burdens they shouldered.

The situation is not altered by the fact that the plaintiffs, as a result of their unique system of charges, had some patients who were residents of Ohio County, West Virginia. Nor is it significant that Dr. Sams maintains his residence in Wheeling, for the significant thing is that he and the other plaintiffs maintain and conduct their clinic and their practices in Bellaire, Ohio. If their intention was to serve primarily patients residing in Wheeling and Ohio County, West Virginia, it would be supposed they would have located their clinic and their offices there. Indeed, Dr. Sams and the other plaintiffs can readily bring themselves within the regulation by relocating their offices and their practices in Wheeling. Meanwhile, as long as they persist in centering their practices in Bellaire, Ohio, I think they completely fail to show that the regulations lack a rational basis either as applied to them or to other medical doctors practicing in Ohio and serving, exclusively or primarily, Ohio patients.

Since the regulations appear to me to have a firm basis in rationality, I think we have no power to strike them down. If we, as judges, were of the opinion that some other conceivable alternative would be preferable, an opinion in which I am not prepared to join, it is not enough to invoke the strictures of the equal protection clause of the Fourteenth Amendment.