James AASUM, Plaintiff,

v.

GOOD SAMARITAN HOSPITAL et al.,
Defendants.

Civ. No. 72–722.

United States District Court,
D. Oregon.

May 15, 1975.

Frank E. Day, Portland, Or., for plaintiff.

Jack L. Kennedy, Portland Or., for defendants.

## OPINION

BURNS, District Judge:

This action is brought by James Aasum, a licensed chiropractic physician, against Good Samaritan Hospital in Corvallis, Oregon. Plaintiff alleges that the hospital's refusal to permit him to use its clinical laboratory facilities in the treatment of his patients is unreasonable discrimination in violation of the XIVth Amendment and 42 U.S.C. § 1983.

Good Samaritan Hospital is a private non-profit corporation. Dr. Aasum is licensed by the State Board of Chiropractic Examiners to practice in Oregon. Prior to July 1971, he had been referring his patients to Good Samaritan's clinical laboratory for approximately ten years. On July 12th, the hospital's administrator, James Mol, issued a directive limiting use of the laboratory facilities to members of the medical staff and physicians licensed by the Oregon State Board of Medical Examiners. Plaintiff was not advised of this policy change and first became aware of\it when one of his patients was refused access. Formal approval of the policy was granted by the Board of Directors of the hospital at a meeting on January 25, 1972. As a result, Dr. Aasum was forced to refer patients to medical physicians for referral to other clinical laboratories, and some patients failed to return. Plaintiff therefore asks for special damages resulting from actual lost income and general damages of $50,000 arising from the loss of approximately 25 patients.

■ Plaintiff's first hurdle is jurisdiction. He contends that 28 U.S.C. § 1343 confers original jurisdiction of § 1983 civil rights claims on federal district courts. Jursdiction does not arise under § 1343, however, unless state action is involved in the denial of an

individual's constitutional rights and privileges.[1]

 Formally, Good Samaritan Hospital is a "private" institution. However, conduct that is formally private may "become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the . . . limitations placed upon state action." Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966). "While the principle is easily stated, the question of whether particular discriminatory conduct is private, on the one hand, or amounts to 'state action,' on the other hand, frequently admits of no easy answer." Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972). It is "only by sifting facts and weighing circumstances [that] the nonobvious involvement of the State in private conduct can be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

Defendants argue that in denying Dr. Aasum and his patients access to its laboratory, the hospital was acting solely as a private corporation and, therefore, not under color of state law. Plaintiff contends otherwise and offers the following instances of intrusion by the State of Oregon into Good Samaritan's affairs:

1) Under Regulation 23–126 of the Oregon Department of Human Resources, a general hospital is required to have an effective governing body legally responsible for the conduct of the hospital as an institution. Plaintiff believes that by empowering this body, the State becomes involved in any discriminatory acts which the hospital commits.

2) Good Samaritan's by-laws provide for a corporate Board comprised of seven members. Four members, including the Episcopal Bishop of the Diocese of Oregon, are affiliated with the Protestant Episcopal Church. The remaining three members are appointed separately by the City Council of Corvallis, the County Commissioners of Benton County, Oregon, and the President of Oregon State University. Each of these public institutions obtains its powers from the State of Oregon.[2] Plaintiff asserts that because the Bishop "is a titular member and rarely attends," the effective membership of the Board is six rather than seven, and that the presence of three "state-appointed" members on a six-member board transmutes board action into state action.

3) Good Samaritan has been the recipient of federal funds under the Hill-Burton Act,[3] for the purpose of rebuilding and enlarging its facilities. The hospital also receives both state and federal tax exemptions as a non-profit corporation. Plaintiff believes that these tax exemptions and the acceptance of Hill-Burton funds constitutes state action within the meaning of § 1983.

4) Oregon requires all hospitals to be inspected once every two years by the State Board of Health. Plaintiff argues that such regulation involves the State in the general administration of the hospital.

5) Dr. Aasum's use of Good Samaritan's facilities was discovered by Mr. Mol on July 12, 1971, following a recommendation by the Oregon State Board of Medical Examiners that only licensed physicians be allowed to use the hos-

1. The relevant portion of 28 U.S.C. § 1343 reads as follows: "The district courts shall have original jurisdiction of any civil action authorized by law to be conmmenced by any person: . . . (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

2. Ore.Const. Art. XI, Sec. 2; Art. VI, Sec. 10; Ore.Rev.Stat., Chap. 351.

3. 42 U.S.C. § 291 et seq.

pital's laboratory. Mr. Mol issued his directive that same day. He also wrote to the Oregon Attorney General to obtain copies of previous opinions regarding this subject. These opinions were available to him prior to the formal approval of his action by the hospital Board on January 25, 1972. Plaintiff contends that this reliance upon the recommendation of the State Board of Medical Examiners and upon the opinions of the Attorney General constitutes state action.

A thorough analysis of the question of state action by private hospitals and a three-pronged test for determining its existence are provided by Barrett v. United Hospital, 376 F.Supp. 791 (S.D. N.Y.1974). To subject "private" institutions to the limitations of § 1983 and the XIVth Amendment ". . . it must be shown (1) that the state's involvement with the private institution is 'significant,' (2) 'that the state must be involved not simply with some activity of the institution . . . but with the activity that caused the injury' (hereinafter referred to as the 'nexus' requirement) and (3) that the state's involvement must aid, encourage or connote approval of the complained activity." *Id.* at 797 [4]. This standard derives from the nexus requirement set forth by the Supreme Court in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the governing decision in the area of private versus state action. I have tested each of plaintiff's complaints by this standard.

█ 1) The empowering of a hospital governing board by the Oregon legislature is not prohibited state action. Although this involvement in Good Samar-

itan's affairs is significant, there is no direct "nexus" between the creation of the Board by state statute and the actual decision that caused the injury to Dr. Aasum. Plaintiff attempts to compare this situation with the holding in *Moose Lodge*, supra, in which he claims the Supreme Court ". . . found state action where the Liquor Control Board, a state agency, adopted a regulation requiring a club licensee to adhere to all the provisions of its constitutions and by-laws, and those provisions proved to be discriminatory." But this holding applied only to those clauses of the Lodge's constitution that involved racial discrimination. These clauses were directly supported by Pennsylvania's liquor control regulations, which required adherence to them. Apart from this exception, the court held that:

> " . . . the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board does not sufficiently implicate the State in the discriminatory guest policies of Moose Lodge to make the latter 'state action' within the ambit of the Equal Protection Clause of the Fourteenth Amendment." [5]

Nor does the State of Oregon approve a decision to bar chiropractors from Good Samaritan's laboratory facilities, merely by empowering a governing board for the hospital. Absent a specific showing of encouragement or support by the state, the nexus between the empowering statute and the Board's decision is insufficient to establish state action.

█ 2) State action does not result from the presence of three state-appointed members of the hospital's seven-

---

4. Departure from this standard may be required where a "private" institution is engaged in racial discrimination or a traditionally "public function." Barrett v. United Hospital, 376 F.Supp. 797–800 (S.D.N.Y. 1974). Neither circumstance is involved in this case. Dr. Aasum has alleged no racial discrimination and the activities of "private" hospitals are generally not governmental in nature. *Id.* 376 F.Supp. at 799; Straube v.

Larson, Civil No. 74–308 (D.Or.1974). See also *Scott.v. Eversole Mortuary*, 522 F.2d 1110 (9th Cir., 1975), for a thorough discussion of state action filed between filing and publication of this opinion.

5. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 177, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972).

person corporate board. In Jackson v. Statler Foundation, 496 F.2d 623 (2nd Cir. 1973) the plaintiff brought suit against thirteen charitable foundations located in Buffalo, New York, alleging racial discrimination because these foundations refused to hire him as a director of their foundation or grant money to his foundation due to his race. The by-laws of one of the foundations provided for a governing committee with a majority of its members appointed by public officials. In its decision to remand on the issue of state action, the Court stated:

". . . here public officials, named in their *ex officio* capacities, control the selection of a majority of the governing body, and the Buffalo Foundation appears to have established this procedure for the very purpose of involving the public in its activities. This participation is neither insignificant nor neutral. Therefore, as to the Buffalo Foundation, a finding of 'state action' may be warranted even if the court should find only some other significant evidence of 'state action.'" Jackson v. Statler Foundation, supra, at 635.

Reliance on *Jackson* misses the mark, however. First, the *Jackson* holding was specifically limited to situations involving racial discrimination [6] because the court recognized that the standard for other state action claims has consistently been less strict.[7] Secondly, in *Jackson* the public authority named a majority of the board. Here, it named a minority. Even if the Bishop rarely attends, this means only that publicly appointed members might prevent action which was desired to be taken by the privately appointed members. of the board. To say that a three member minority makes

board action state action is not only bad law, but bad arithmetic as well.[8]

■ 3) The question of whether a private hospital's receipt of federal funds under the Hill-Burton Act, coupled with federal and state tax exemptions, constitutes state action under § 1983, has been settled in this circuit by Ascherman v. Presbyterian Hospital of Pacific Medical Center Inc., 507 F.2d 1103, 1105 (9th Cir. 1974).[9]

"The mere receipt of Hill-Burton funds, even coupled with the alleged tax exemptions, is not a sufficient connection between the state and the private activity of which appellant complains to make out state action."[10]

Although *Ascherman* involved a loss of privileges by a licensed physician rather than by a chiropractor, the lack of a "nexus" with government funding or tax exemptions is equally apparent in both cases.

■■ 4) The inspection of private hospitals by the State Board of Health is not state action *per se*. In *Barrett*, supra, the court applied its three-pronged test for the existence of state action to New York's "pervasive scheme of statutes and codes which regulate almost every facet of hospital activity.[11]" Although it considered these regulations to be significant state involvement, the court found no "nexus" between the regulations and the decision to terminate a staff physician. Nor did the regulation "aid, encourage, or connote approval" of this activity.[12] Relying on Mulvihill v. Julia L. Butterfield Memorial Hospital, 329 F.Supp. 1020 (S.D.N.Y. 1971), the court concluded:

"The mere fact that New York regulates the facilities and standards of care of private hospitals does not *per*

---

6. Jackson v. Statler Foundation, 496 F.2d 623 (2nd Cir. 1974) at 635.

7. *Id.* at 628–629.

8. The Board's composition has since been increased to nine, but the number of state-appointed members has remained at three.

9. *Accord,* Straube v. Larson, Civil No. 74–308 (D.Or.1974).

10. As the *Ascherman* panel points out, a different result is required where the regulation of a private hospital by the state encourages racial discrimination.

11. 376 F.Supp. at 796.

12. *Id.* at 802.

*se* make the acts of the hospital in discharging physicians the acts of the state. 'Such a blanket rule,' said *Mulvihill,* 'would overlook "the essential point—that . . . the state action, not the private action, must be the subject of complaint." ' ".[13]

The inspection of Good Samaritan's facilities by the State of Oregon for the purpose of regulating the quality of health care within the state neither encouraged nor gave approval to the decision to exclude Dr. Aasum. Absent this "nexus," there is no state action.

5) A "nexus" does exist, however, between the recommendation by the Oregon Board of Medical Examiners that Good Samaritan prevent persons not licensed by the Board from using its facilities, and the decision by the hospital Board that caused injury to the plaintiff. Dr. Aasum had been sending his patients to the laboratory for ten years prior to this recommendation. There is no evidence that this pattern would have been interrupted, apart from the Board of Medical Examiners' telephone call to Mr. Mol on July 12, 1971, regarding unlicensed individuals. Although the recommendation was not directed toward Dr. Aasum specifically, it is obvious that the hospital's response to it denied his patients further access to the laboratory. Mr. Mol testified as follows:

Q: Now I call your attention to July the 12th, 1971 at—on that day, I believe, you told us that you received a call from the Oregon State Board of Medical Examiners, is that correct?

Mol: That's correct.

Q: . . . isn't it a fact that they they brought to your attention that you were permitting persons not members of the medical staff or the hospital or licensed by the Board of Medical Examiners to use facilities at your hospital, is that correct?

Mol: That's correct.

Q: And they suggested that this should be stopped, is that correct?

Mol: Yes.

\* \* \* \* \* \*

Q: . . . It's my understanding that on July 12, you issued a memorandum; and would you tell the Court whether or not Exhibit 22 is a memorandum that you issued on that day?

Mol: It is.

\* \* \* \* \* \*

Q: And that memorandum was prompted by the phone conversation you had with the Oregon Board of Medical Examiners?

Mol: That's correct.

The Board of Directors officially approved this memorandum several months later. There is a direct "nexus" therefore between the original recommendation by a state agency and the hospital's decision as a private institution. The Board of Medical Examiners is empowered to establish and enforce standards for determining professional qualifications of applicants for licenses to practice medicine, and to exercise general supervision over the practice of medicine within the state of Oregon.[14] Its recommendation, therefore, directly "encouraged and approved" the hospital's decision and is state action within the meaning of § 1983.

Plaintiff also points to the Attorney General's opinions that Mr. Mol requested. These opinions were never introduced into evidence, however. Nor was there testimony indicating a reliance on them by either Mr. Mol in issuing his directive on July 12, 1971, or by the Board of Directors in approving

---

13. Id. at 803. If this contention were to be accepted, we would run the risk of sweeping into federal jurisdiction through § 1983 and § 1343 every garden variety tort committed by an Auctioneer, Barber, or Cosmetic Therapist (to canvas alphabetically only the first three of many private activities over whose shoulder the state's scrutiny extends). If such a jurisdictional leap is to be taken, it will have to be by a court higher than this one.

14. Ore.Rev.Stat., Chap. 677.265.

this decision on January 25, 1972. In the absence of the opinions themselves, or of evidence of substantial reliance on them by the defendants, I cannot conclude that they provide the "nexus" claimed for them by plaintiff with the Board's decision to bar the plaintiff from the laboratory.

In reaching the conclusion that reliance on the Board of Medical Examiners' recommendation constitutes state action, I limit my holding to the facts of this particular case. As I read the jurisdictional requirements of § 1343, a private hospital would not be subject to suit if it chose of its own accord to exclude chiropractors. It is only when an agency of the state becomes involved in this decision that the protections of § 1983 are activated by virtue of § 1343. Whether or not state action is present must be determined in each individual case, where the factors are weighed with a sensitivity for the drastic changes which would be produced by an expansive judicial reading of those statutes.

Discrimination between licensed physicians and chiropractors that involves state action is not automatically prohibited by the XIVth Amendment. The "prohibition of the Equal Protection Clause goes no further than the invidious discrimination." Williamson v. Lee Optical, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). Or, stated another way, the hospital's rule distinguishing between physicians and chiropractors must be reasonable and not arbitrary. The Supreme Court has often said that:

"The equal protection clause of the 14th Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary." [15]

This test was applied in Sams v. Ohio Valley General Hospital Association, 413 F.2d 826 (4th Cir. 1969) where two Ohio County, West Virginia, hospitals denied staff privileges to physicians having their offices outside the county. The court found this discrimination unconstitutional because there was no rational relationship between the rule itself and the hospital's purpose to select qualified staff members. Similarly, these defendants have violated the XIVth Amendment only if they have relied on differences which were not rationally related to the purposes that Good Samaritan sought to achieve.

Oregon law distinguishes between several professions practicing different systems of treating disease, including physicians,[16] dentists,[17] podiatrists,[18] and chiropractors.[19] The authority for licensing health care facilities, which involves distinguishing between these professions, resides with the Health Division of the Department of Human Resources.[20] This responsibility has been delegated to the governing body of each hospital.[21]

Good Samaritan's Board of Directors has exercised this authority in accordance with the State's classification scheme, by limiting the practice of medicine which the hospital permits to the system of treatment recognized by licensed physicians and dentists.[22] The Joint Commission on Accreditation of Hospitals also recommends that hospital medical staffs be limited to fully licensed physicians, dentists and podiatrists. It does not approve chiropractors. Mr. Mol wrote to the Commission

15. Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369; Morey v. Doud, 354 U.S. 457, 463, 77 S.Ct. 1344, 1349, 1 L.Ed.2d 1485 (1957); accord, McGowan v. State of Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

16. Ore.Rev.Stat., Chap. 677.

17. Ore.Rev.Stat., Chap. 679.

18. Ore.Rev.Stat., Chap. 682.

19. Ore.Rev.Stat., Chap. 684.

20. Ore.Rev.Stat., Chap. 431.325.

21. Health Div.Reg. 23.126(2).

22. Article VI, By-Laws of Good Samaritan Hospital (Plaintiff's Exhibit # 28).

on Accreditation to ask if the continued usage of Good Samaritan's laboratory by chiropractors would affect the hospital's accreditation. The response indicated that this practice was unacceptable to the Commission. Defendants contend that this discrimination between physicians and chiropractors is reasonable because it is based on classifications created by state law that are rationally related to the purpose of providing adequate health care for the state. They also believe that it was reasonable to discriminate between these groups in order to protect Good Samaritan's accreditation, by limiting the use of the hospital's laboratory to licensed physicians and dentists. I agree.

It has long been settled that apart from arbitrary or unreasonable exclusion, the XIVth Amendment does not assure physicians or other professionals an unlimited right to practice medicine on the staff of a particular hospital. Hayman v. City of Galveston, 273 U.S. 414, 47 S.Ct. 363, 71 L.Ed. 714 (1927). *Hayman* involved the exclusion of an osteopathic physician from the staff of a research hospital. Hospitals also exclude incompetent physicians and unlicensed medical practitioners as well. They do so primarily to protect an important interest—their accreditation. This interest was relied on by the Supreme Court of Washington in Rao v. Board of County Commissioners (Pierce), 80 Wash.2d 695, 698, 497 P.2d 591, 592–595, (1972), cert. denied 409 U.S. 1017, 93 S.Ct. 436, 34 L.Ed.2d 309, where the Court refused to compel a private hospital to reinstate a physician who had been dismissed for reasons of incompetence. The court stated:

"It cannot be seriously questioned that a hospital, whether private or public, has a legitimate interest in the quality of its medical staff. It is in its interest to maintain its accreditation, and its economic success depends in large degree upon its good reputation.

We think it not improbable, too, that the members of the staff of a hospital consider that when they protect the reputation of the hospital of whose staff they are members, they serve their individual reputations as well.

And of course the most vital interest in the quality of medical care received in a hospital is that of the public which it serves. Assuming, without deciding, that private hospital authorities have no legal duty to examine into the qualifications of applicants for admission to the institution's medical staff, they have toward this group at least an ethical duty to do so. We are aware of no legal principle which would prompt this court to say that they have no *right* to pass upon the competence of such applicants. As we recognized in Group Health Cooperative of Puget Sound v. King County Medical Society, supra, even the governing bodies of public hospitals are vested with discretion in admitting doctors to staff privileges, and the courts wil interfere with the exercise of this discretion only if it is shown to be 'arbitrary, tyrannical, or predicated upon a fundamentally wrong basis.' "

This interest in the provision of adequate medical services for the public is the basis for both Oregon's statutory classification of health care professionals and Good Samaritan's decision to exclude chiropractors from its medical staff and facilities. There is a rational relationship between this purpose and the classifications themselves, because to maintain its accreditation the hospital must satisfy the Joint Commission on Accreditation of Hospitals, which uses the same classifications. Good Samaritan has wisely chosen to follow the Commission's standards in selecting its staff. To do otherwise in this situation would have jeopardized its accreditation. This would in turn have lessened its effectiveness as a provider of medical services, which is the purpose for which it was created. Hospitals have in the past been allowed to discriminate between competent physicians and incompetent

physicians or osteopaths in order to provide high quality health care and maintain their accreditation. I see no reason why chiropractors cannot be excluded from Good Samaritan's staff and denied access to its laboratory facilities for the same reasons. This discrimination is rationally related to the hospital's purpose and, therefore, not prohibited by the XIVth Amendment.

■ Plaintiff reminds me that although he is not a physician, he is licensed by the State of Oregon and authorized to draw blood as a chiropractor. This implies a need for laboratory facilities. He contends that Good Samaritan is the only laboratory facility in Corvallis that provides the quality of analysis that he requires. While this may be so, Hayman v. City of Galveston, supra, makes plain that he is not entitled to such access merely because of his status as a licensed professional. Dr. Aasum must, therefore, continue to make use of the laboratory facilities already available to him elsewhere.

This opinion shall serve as findings of fact and conclusions of law pursuant to F.R.Civ.P. 52.