**Virgil WALKER and Shirley Brown, Appellants,**

**v.**

**Clovis H. PIERCE, M.D., et al., etc., Appellees.**

**Virgil WALKER and Shirley Brown, Appellees,**

**v.**

**Clovis H. PIERCE, M.D., Appellant,**

**George A. Poda, M.D., etc., et al., Defendants.**

**Nos. 75–2212 and 75–2213.**

United States Court of Appeals, Fourth Circuit.

Argued March 17, 1977.

Decided July 26, 1977.

Butzner, Circuit Judge, filed opinion concurring in part and dissenting in part.

**610**

Neil Bradley, Atlanta, Ga. (H. Christopher Coates, Atlanta, Ga., Joseph J. Levin, Montgomery, Ala., Melvin L. Wulf, New York City, Emily Calhoun, Athens, Ga., Carlton Bagby, Columbia, S. C., on brief), for appellants in 75–2212 and for appellees in 75–2213.

Stephen G. Morrison, Columbia, S. C. (R. Bruce Shaw, Wm. S. Davies, Jr., Nelson Mullins, Grier & Scarborough, Columbia, S. C., B. Henderson Johnson, Jr., Williams & Johnson, Aiken, S. C., on brief), Edward E. Poliakoff, Asst. Atty. Gen., W. G. Lynn, Jr., Aiken, S. C. (Daniel R. McLeod, Atty. Gen., C. Tolbert Goolsby, Jr., Deputy Atty. Gen., John L. Choate, Asst. Atty. Gen., Columbia, S. C., on brief), for appellees in 75–2212 and for appellants in 75–2213.

Before BRYAN, Senior Circuit Judge, and BUTZNER and RUSSELL, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

Violation of their civil rights [1] was laid, in this action for damages and declaratory and injunctive relief by Virgil Walker and Shirley Brown, black females, to Clovis H. Pierce, the attending obstetrician at the Aiken County Hospital in South Carolina for sterilizing them, or threatening to do so, solely on account of their race and number of their children, while they were receiving medical assistance under the Medicaid program.[2] The other defendants, the Chairman of the Board of Trustees of the Hospital, its Administrator, the Director of the Department of Social Services of Aiken County, the State Commissioner of the Department of Social Services of South Carolina and the Hospital, are charged with conspiring or acting in concert with Dr. Pierce in the unlawful acts imputed to him.

Verdicts, those directed and those returned by the jury, went for the defendants except Pierce, against whom the jury as-

1. They predicate their imputations of liability on the First, Fourth, Fifth, Eighth, Ninth, Thirteenth and Fourteenth Amendments and 42 U.S.C. §§ 1981, 1983, 1985(3) and 2000d:

*Section 1981*
  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Section 1983*
  Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Section 1985(3)—this reads in pertinent part:*
  If two or more persons in any State or Territory conspire . . . for the purpose of de-

priving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

*Section 2000d*
  No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

2. Medicaid is a program of health service financed approximately 75% by the Federal Government and the remainder by the State with the latter administering it. 42 U.S.C. § 1396, et seq.

sessed damages of $5.00 in favor of Shirley Brown. Judgments were passed accordingly, including denial of declaratory and injunctive relief. On plaintiffs' appeals we affirm; on the obstetrician's we reverse.

### The Complaint

As faultlessly put in the plaintiffs' brief: "The essence of the complaint was that Medicaid recipients were being required to consent to undergo a tubal ligation if they were delivering a third living child."

Centering the controversy is the policy previously announced and constantly pursued in practice by the doctor, testified to by him as follows:

> "My policy was with people who were unable to financially support themselves, whether they be on Medicaid or just unable to pay their own bills, if they were having a third child, to request they voluntarily submit to sterilization following the delivery of the third child. If they did not wish this as a condition for my care, then I requested that they seek another physician other than myself."

There is no question of his professional qualifications or experience.

As drawn by the plaintiffs, he is the arch-offender. The accusation is incursion upon their Constitutional rights of privacy, due process of law and equal protection of the law as well as of their statutory privileges against discrimination on account of their race and color, all by subjecting or threatening the plaintiffs as citizens of the United States with involuntary sterilization. These deprivations, they further say, are the result of the effectuation of Pierce's policy under color of State law, that is, under the Medicaid program administered by South Carolina. His codefendants, to repeat, are impleaded for conspiring and acting in concert with him, and for acquiescing in his unlawful conduct. 42 U.S.C. §§ 1981, 1983, 1985(3) and 2000d. Personal injury has been suffered, each

plaintiff asserts, as a direct consequence of acts of the defendants under this policy.

Now to follow are the facts as elicited by the plaintiffs from their evidence, but denied by the defendants as inculpations of them.

### Plaintiff Walker

Virgil Walker had completed the seventh grade, was separated from her husband and was receiving Aid to Families with Dependent Children [3] and Medicaid benefits. Expecting her fourth child, she first went to Pierce on January 7, 1972. During this consultation, he discussed family planning and his sterilization policy. Walker refused to consent. The issue again came up at the second visit and she again declined. Walker testified that Pierce threatened to have her State assistance terminated unless she cooperated. She called another doctor, but he was not taking new patients.

On February 4, 1972, Spears, a Department of Social Services caseworker assigned to Walker, received a note from Pierce's office asking that he talk with Walker about sterilization. Thereupon, Spears, according to his testimony, spoke with her on February 17th, offering to get her a second doctor. On the other hand, Walker stated that Spears had said there was nothing he could do. Then she returned to Pierce and subsequently signed a consent form for sterilization.

Her fourth child was delivered at the Aiken County Hospital April 16, 1972 by Dr. Billy Burke, an obstetrician who substituted for Pierce on occasion. Burke discussed tubal ligation with Walker. Her response was that she did not want additional children and understood that it would be a permanent sterilization. Two more consent forms were then signed. Pierce performed the operation April 17, 1972. She protested no further because, she said, it would have been futile.

3. As with the Medicaid program, this welfare assistance plan is Federally funded and State administered. It provides financial assistance, rehabilitation and other services to needy de- pendent children and the parents or relatives with whom they live to strengthen family life. 42 U.S.C. § 601 et seq.

Walker's hospital bills and doctor's fees were paid by Medicaid. Under the South Carolina plan operated by the Department of Social Services, the patient-physician relationship is one of free choice for both parties. The physician, under no contract with the State, simply submits his bill when treatment is concluded to the Medicaid insurance carrier instead of the patient.

### Plaintiff Brown

Shirley Brown consulted Pierce regarding her third pregnancy. She, too, was separated from her husband and had taken job maternity leave from Seminole Mills. On her initial visit, Brown paid Pierce $50.00. Sterilization was not discussed. A $250.00 balance due on his fee was satisfied in part by Brown and her husband and partially by the health insurance plan at the mill.

At the end of August 1973, Brown qualified for Medicaid benefits. She was delivered of her third child at the Hospital September 2, 1973 by a doctor other than Pierce. The hospital bills, not Pierce's fees, were to be paid by Medicaid. After the delivery, Pierce requested his nurse to obtain Brown's consent to sterilization. Brown refused. Upon word of her refusal, Pierce saw no necessity for further hospitalization and ordered her discharge and release from the Hospital.

Her mother intervened, offering to pay the hospital bill, but Brown left September 3, 1973, "afraid something might happen to her." Protest was made to the defendant Nesbit, Hospital Administrator, who suggested she file a complaint with the Board of Trustees since he had no control over a doctor's discharge of patients. At trial, Brown's attorney conceded that she sustained no actual damages in leaving the Hospital.

### The Defendants

Defendant Nesbit stated that he first learned of Pierce's policy in July, 1973 from newspaper accounts appearing in the local papers. He reported it to the Chief of Obstetrics and Gynecology at the Hospital but at that time he received no answer as to anything he should do.

Defendant Poore, Director of the Aiken County Department of Social Services since March 23, 1972, testified that he also originally learned of Pierce's policy from press items on July 17, 1973. He called a staff meeting and arranged for a doctor in Augusta, Georgia to see obstetric patients. Transportation for them was provided by the Department.

Defendant Ellis, State Commissioner of DSS, became aware of the sterilization policy through July, 1973 news accounts. He fixed a meeting for July 26 between Pierce, a Medicaid deputy and a State attorney general. An investigation included a review of records of Pierce's patients and interviews with Medicaid recipients sterilized at the Hospital in the first six months of 1973.[4] Early September, Ellis and a State attorney general met with Pierce and his attorney. Ellis asked Pierce to sign an affidavit stating that he would not discriminate against Medicaid patients. Pierce declined. Finally Ellis wrote Pierce September 27, 1973 that his continued refusal to sign the affidavit forced the Department to impose a non-payment sanction for Pierce's submitted Medicaid bills. Pierce no longer treated Medicaid patients. From January 1, 1972 to June 30, 1973 the doctor had received $60,000 in Medicaid fees.

### The Verdicts and Judgments

The claims against Poda, Chairman of the Board of the Hospital, were withdrawn. In the Walker action under section 1981 verdicts were directed for all of the defendants except Dr. Pierce, Nesbit individually and as Administrator of the Hospital and the Hospital itself, but the jury returned a ver-

---

4. The investigation revealed 50 Medicaid deliveries and 18 Medicaid tubal ligations during this period. Forty of the deliveries and 17 of the ligations were done by Pierce. Of the 50 deliveries, 42 women were black, 32 single, nine separated, eight married and one widowed. Sixteen women sterilized were black and either single or separated; one was white and separated and one was black and married.

dict for the latter defendants; in the Walker action under section 1983, verdicts were directed for all defendants except Dr. Pierce and Nesbit, but the verdict acquitted these two. In Brown's action under section 1981, directed verdicts were granted for all defendants except Pierce, Poore and the Hospital, but the jury found for them. In Brown's action under section 1983, verdicts were instructed for all defendants except Dr. Pierce and Poore. However, the jury found for Poore but against Dr. Pierce assessing damages at $5.00 "Nominal Damages".

As weighed by the Court, the evidence was not sufficient to permit a finding of a conspiracy under section 1985(3), and, therefore, the case was not submitted to the jury on that count, directed verdicts going for all the defendants. Judgments, with costs, went accordingly. Motions for new trials were denied, as was a motion for judgment n. o. v. by Dr. Pierce. Previously the Court had denied plaintiffs' request for a class action under Rule 23(a), (b)(1) and (b)(2) F.R.Civ.P.

The claim for a class action was not argued before the court but the plaintiffs noted that they reserved the point. The Court did not abuse its discretion in refusing the request and the record confirms the soundness of this resolution. Nor is error apparent in the directed verdicts. The proof was not adequate to establish discrimination, racial or otherwise, conspiracy, or recklessness or want of good faith, as to those favored by the directions, and the jury found none save against Pierce under 1983. Therefore, without further discussion we affirm as to all defendants in each case save as to the verdict against Dr. Pierce.[5] In his instance we reverse and enter final judgment.

### The Case Against Dr. Pierce

■ We perceive no reason why Dr. Pierce could not establish and pursue the policy he has publicly and freely announced. Nor are we cited to judicial precedent or

statute inhibiting this personal economic philosophy. Particularly is this so when all persons coming to him as patients are seasonably made fully aware of his professional attitude toward the increase in offspring and his determination to see it prevail. At no time is he shown to have forced his view upon any mother. Indeed, quite the opposite appears. In the single occasion in this case of a sterilization by this doctor, not just one but three formal written consents were obtained—the first before delivery of the fourth child and two afterwards.

■ But if his conduct is nevertheless to be judged by the factors of section 1983, Dr. Pierce was not a violator. He was not acting under color of State law when treating the only successful plaintiff, Brown. His fee for her delivery was paid by her and her employer's insurance plan; there was no use of Medicaid money. Incidentally, he did/not sterilize her; the tort charged to him is his discharge and release of her from the Hospital, an accepted procedure there. Receipt by the Hospital of Hill-Burton funds, 42 U.S.C. 291 et seq. did not convert Dr. Pierce into a participant in a Federal program and thus in State action. *Ascherman v. Presbyterian Hospital,* 507 F.2d 1103, 1105 (9 Cir. 1974). No decision has been advanced holding that a physician by simply practicing in such an institution acts under color of State law. Certainly the Fourth Circuit did not do so in its line of decisions on the question terminating in *Doe v. Charleston Area Medical Center, Inc.,* 529 F.2d 638 (1975).

The judgments of the District Court are affirmed except that granted Shirley Brown against Clovis H. Pierce, which is reversed with final judgment for the defendant.

Affirmed in part; reversed in part; and final judgment.

BUTZNER, Circuit Judge, concurring in part and dissenting in part:

I join in affirming the judgments in favor of the hospital, its officers, and the

---

5. No fault is found in the rulings of the Court on discovery or on the motion to modify the

jury selection method or in the Court's denial of declaratory and injunctive relief.

state and county officials. The evidence did not prove them to be willful participants in Dr. Pierce's practice of sterilizing Medicaid patients.

I dissent from the reversal of the judgment against Dr. Pierce. The facts and the law fully justify the district judge's ruling that Dr. Pierce was acting under color of state law within the meaning of 42 U.S.C. § 1983.

At the outset, it is necessary to note the distinction between Dr. Pierce's professional role as a physician treating Medicaid patients and his role as a participant in the fiscal and administrative aspects of the Medicaid program. Title 42 U.S.C. § 1396a, dealing with state plans for the Medicaid program, is designed to avoid governmental intrusion in the doctor-patient relationship. "[T]he very heart of the congressional scheme is that the physician and patient should have complete freedom to choose those medical procedures for a given condition which are best suited to the needs of the patient." *Beal v. Doe,* —— U.S. ——, ——, 97 S.Ct. 2366, 2374, 53 L.Ed.2d 464 (1977) (Brennan, J., dissenting). Thus, a physician paid by Medicaid does not act as an agent of the state or under color of its laws when he decides what medical care and services his patient's health requires. *Cf. Byrne v. Kysar,* 347 F.2d 734, 736 (7th Cir. 1965); *Duzynski v. Nosal,* 324 F.2d 924, 929 (7th Cir. 1963). Consequently, it is necessary to ascertain whether Dr. Pierce's policy of sterilizing Medicaid patients was based on considerations of their health.

When Dr. Pierce treated a patient who could pay for delivery of her child, he did not exact consent for sterilization regardless of the number of her children. If, however, the patient already had more than two children and her bill was to be paid by Medicaid, he refused to treat her unless she consented to sterilization. One witness testified:

> He came in and he hadn't examined me or anything. I was laying on the table. And, he said, "Listen here young lady." He said, "This is my tax money paying for something like this." He said, "I am

tired of people going around here having babies and my tax money paying for it." He said, "So, if you don't want this done, you go and find yourself another doctor."

Dr. Pierce's policy of requiring sterilization of Medicaid patients is also illustrated by his treatment of Mrs. Shirley Brown. As long as it appeared that her expenses were being paid from private funds, Dr. Pierce was content to accept her as a patient without conditioning either his services or her hospitalization on her consent to sterilization. When he learned from hospital records that her hospital bill was being paid by Medicaid, he directed a nurse to obtain her consent to sterilization. Upon Mrs. Brown's refusal, he ordered her discharged from the hospital.

Had Dr. Pierce's decisions to sterilize his patients been based on their medical needs, he would not have acted under color of state law within the meaning of § 1983. *See, e. g., Byrne v. Kysar,* 347 F.2d 734 (7th Cir. 1965); *Duzynski v. Nosal,* 324 F.2d 924 (7th Cir. 1963). However, the foregoing evidence establishes beyond doubt that Dr. Pierce's policy pertaining to sterilization was based on economic factors instead of the health of his Medicaid patients. It is clear that he undertook to grant or deny Medicaid benefits for reasons unrelated to his patients' health. It therefore becomes necessary to determine next whether Dr. Pierce's policy of sterilization for economic reasons establishes that he was acting under color of state law.

There is no litmus test for ascertaining whether an ostensibly private person is in fact acting under color of state law. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). This inquiry must determine "whether there is a sufficiently close nexus between the State and the challenged action of . . . [the person under scrutiny] so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan*

*Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). Action under color of law may be found when (A) the state is involved in the questioned activity, or (B) the private actor has assumed a state or ·public function. *See Greco v. Orange Memorial Hospital Corp.,* 513 F.2d 873, 878 (5th Cir. 1975). Among the significant factors to be considered are the private person's operation as an integral part of a comprehensive governmental program and his consequent receipt of substantial public funds. *Sams v. Ohio Valley General Hospital Assoc.,* 413 F.2d 826, 828 (4th Cir. 1969); *Simkins v. Moses H. Cone Memorial Hospital,* 323 F.2d 959, 967 (4th Cir. 1963). Applying these principles, I believe Dr. Pierce acted under color of state law.

In this case, the state's involvement is readily apparent. The questioned activity is the grant or denial of Medicaid benefits for fiscal reasons unrelated to a patient's health. Under the Medicaid statute, the state is responsible for ascertaining which women are entitled to receive Medicaid benefits for the delivery of their children. Because the state is involved in the activity under scrutiny, one criterion for applying § 1983 is satisfied.

Furthermore, the evidence discloses that Dr. Pierce assumed a state function. South Carolina does not contract directly with physicians to participate in Medicaid; rather, qualified doctors are free to accept Medicaid patients, if they choose. Under this arrangement, a pregnant woman can select a participating doctor of her choice, and the doctor can accept or reject the patient. Freedom of choice on the part of both physician and patient is assured as an essential part of the program. When a physician accepts a Medicaid patient, the state is not made aware of the relationship until the doctor's bill is presented to the state's agent (a private insurance company) for processing and payment. By these procedures the state delegates much of its administrative responsibility for the operation of the Medicaid program to individual doctors. Therefore, a doctor who represents himself to the public as a qualified Medicaid practitioner assumes a state or public administrative function when he conditions the grant or denial of Medicaid benefits on requirements not connected with the patient's health.

Dr. Pierce was free to decline to treat any or all persons dependent on Medicaid. He opted to participate in the program and accepted patients entitled to receive Medicaid. He undertook an administrative function when he insisted for economic reasons unrelated to health that a patient otherwise entitled to the delivery of her child by the physician of her choice at Medicaid expense should be sterilized. Finally, as further indication of his operation as an integral part of a comprehensive governmental program, Medicaid paid Dr. Pierce more than $60,000 during the time when the events giving rise to this suit occurred.

These facts and circumstances fully warrant the district judge's conclusion that Dr. Pierce was acting under color of state law. The nexus between the state and Dr. Pierce was sufficient to establish that his sterilization of Medicaid patients for economic reasons not related to their health can be fairly treated as the action of the state. In fact, Dr. Pierce was his patients' most important contact with the state program. Therefore, I would affirm the district judge's ruling that Dr. Pierce was acting under color of law within the meaning of 42 U.S.C. § 1983.